SIGMUND MILLER, TEMPORARY ADMINISTRATOR (ESTATES OF MOHAMED ABDUL-SAMED DIGHIDI ET AL.) *v.* UNITED TECHNOLOGIES CORPORATION ET AL.

SIGMUND MILLER, ADMINISTRATOR (ESTATES OF MOHAMED ABDUL-SAMED DIGHIDI ET AL.) *v.* UNITED TECHNOLOGIES CORPORATION ET AL.
(15012)

BORDEN, BERDON, NORCOTT, KATZ and PALMER, Js.

*(Two justices concurring in part and dissenting in part)*

Argued January 13—decision released June 27, 1995

*Rosalind J. Koskoff*, with whom were *Michael P. Koskoff* and, on the brief, *Mark C. Durkin* and *Richard A. Bieder*, for the appellant (plaintiff as administrator of the estate of Mohamed Abdul-Samed Dighidi).

*Steven E. Arnold*, with whom was *Jack G. Steigelfest*, for the appellee (named defendant).

*Patrick J. Monahan*, with whom, on the brief, was *Charles P. Reed*, for the appellee (defendant General Dynamics Corporation).

*Keith D. Dunnigan*, with whom, on the brief, was *Kevin S. Coyne*, for the appellee (defendant Chandler-Evans, Inc.).

KATZ, J. This appeal requires us to decide whether the trial court properly rendered summary judgment in favor of the defendants, United Technologies Corporation (United Technologies), Chandler-Evans, Inc. (Chandler-Evans), and General Dynamics Corporation (General Dynamics), and against the plaintiff, Sigmund Miller, as administrator of the estate of Mohamed Abdul-Samed Dighidi, based on the government contractor

defense. The threshold issue before the court is whether the government contractor defense, which affords United States government contractors immunity from state tort liability, can apply in a case involving military equipment that the United States government had purchased for resale to a foreign government. If we determine that the defense can apply in such circumstances, we must then decide whether these defendants are entitled, as a matter of law, to immunity under the government contractor defense from the plaintiff's claims alleging design defect and failure to warn.

The trial record, including testimony taken during depositions, reveals the following undisputed facts. On January 20, 1983, two Egyptian pilots embarked on a training mission in a single engine F-16B jet fighter aircraft that had been supplied to the Egyptian government by the United States government as part of the Camp David Accord.[1] This aircraft was owned and operated by the Egyptian government. One of the pilots, Lieutenant Colonel Mohamed Abdul-Samed Dighidi, was the squadron commander and a highly trained and experienced instructor in the operation of F-16 aircraft. The second pilot was Major Gamal Al-Maghraby Hassan. The purpose of the mission was for Dighidi to "check out" Hassan in preparation for his solo flight. A second F-16B flown by two United States Air Force (Air Force) pilots, Major Michael Lotti and Major Harry Morgan, accompanied the Egyptian aircraft as part of the mission.

During the course of the mission, Dighidi communicated to Lotti and Morgan that he was experiencing problems with the engine. He first indicated that the generator had shut down. Thereafter, the oil pressure light came on and the engine failed. Dighidi then maneuvered the aircraft in an attempt to make an

---

[1] The United States government provided the Egyptian government with dual seat F-16B aircraft that were apparently used for training purposes. It also provided the Egyptian government with single seat F-16A aircraft.

emergency landing, but he was unsuccessful and the aircraft crashed approximately one mile short of the runway. Both Dighidi and Hassan were killed in the crash.

A subsequent investigation into the cause of the crash revealed that the Egyptian F-16B had sustained a massive failure of the main fuel pump, a variable displacement vane pump with an inlet vented sideplate (IVSP) configuration,[2] which then caused the engine to fail. The fuel pump had been in use for a total of only 230 hours, which was much less than its expected operational life.[3] It was further determined that damage from cavitation erosion[4] had caused the fuel pump to fail.

---

[2] A fixed displacement pump, such as a gear pump, supplies a constant flow of fuel regardless of the engine's requirements. When the flow is greater than the engine requires, only a portion of the fuel is burned, which causes waste and an undesirable increase in temperature. A variable displacement pump, on the other hand, supplies only that amount of fuel that the engine requires. It is therefore more efficient than the fixed displacement pump and creates no increase in temperature. A vane pump has a rotor of flat, thin rectangular vanes that causes displacement. The IVSP feature refers to the particular inner configuration of this variable displacement vane pump.

[3] It is undisputed that the fuel pump was supposed to perform for 600 "maximum operating hours" before it had to be overhauled. The parties are not in agreement, however, regarding whether the "maximum operating hours" designation is a specification or merely a maintenance guideline.

[4] Cavitation was described during the testimony of various engineers as a phenomenon that occurs when fluid is subjected to variable pressure under closed conditions. For instance, when the pressure on fuel in a fuel pump decreases, it begins to vaporize and tiny air bubbles form. Thereafter, when the pressure on the fuel increases, the bubbles collapse and create pressurized "microjets" of fuel that bombard the metal surfaces of the pump, eroding the surface and causing pitting, erosion and metal fatigue.

Cavitation erosion is a condition that affects and limits the service life of all fuel pumps, and it had been a source of concern with the IVSP vane pump. Although the United States government in 1975 had funded an ongoing "component improvement program" to address problems that limited the service life, reliability, durability and maintainability of the IVSP fuel pump, the cavitation erosion problem was never satisfactorily resolved and the IVSP configuration was eventually replaced with a different configuration.

In October, 1985, Miller, as administrator of the estates of Dighidi and Hassan,[5] brought this action[6] for damages against United Technologies, Chandler-Evans and General Dynamics, pursuant to the Connecticut Product Liability Act, General Statutes § 52-572m et seq., and under theories of negligence, recklessness, warranty and strict liability. Miller alleged that the defendants had improperly designed, manufactured and assembled the fuel pump that was incorporated into the F-16B aircraft's engine, and that the defendants had failed to warn of the dangers of fuel pump failure.

The main fuel pump at issue here was manufactured by Chandler-Evans and identified as the MFP-330. The MFP-330 was a component in the F100-PW-200 engine, which was manufactured by Pratt and Whitney Aircraft (Pratt & Whitney), a division of United Technologies.[7] A United States government contract had been awarded to United Technologies for the development and production of the F100-PW-200 engine, and United Technologies had subcontracted with Chandler-Evans for the production of the MFP-330 fuel pumps. A sep-

---

[5] The Hassan estate accepted an offer of judgment of $200,000 before the government contractor defense was raised and, therefore, the trial court's ruling on the defendants' motions for summary judgment applies only to the Dighidi estate.

[6] Miller actually commenced two separate actions: one in his capacity as temporary administrator of both estates and a second identical action in his capacity as permanent administrator of the estates. These actions were later consolidated and the trial court treated them as one action. We do the same. Subsequently, when the appeal from the trial court was transferred to this court, Harold L. Rosnick, as administrator of the estate of Mohamed Abdul-Samed Dighidi, was substituted as plaintiff.

[7] Pratt & Whitney first developed the F100 series engine for the twin engine F-15 fighter jet aircraft. The F-15 engine was identified as the F100-PW-100 by Pratt & Whitney and the MFP-330 fuel pump was originally designed for and incorporated into that engine. Thereafter, the government chose to use the same engine for the single engine F-16 fighter jet aircraft. Pratt & Whitney identified the F-16 engine as the F100-PW-200. The F100-PW-100 and F100-PW-200 included identical MFP-330 fuel pumps.

arate and distinct United States government contract was awarded to General Dynamics for the production of the F-16 air frame and the installation into the air frame of "government furnished aeronautical equipment," including the F100-PW-200 engines, which had been chosen for and supplied to General Dynamics by the United States government. General Dynamics was not responsible for the design or production of the F100-PW-200 engines, but was specifically required by contract to incorporate them into the F-16 air frame.

The plaintiff elected to bring this action in Connecticut state court because both United Technologies and Chandler-Evans are located in Connecticut.[8] After several years of detailed and voluminous discovery, in September and October, 1992, the three defendants filed motions for summary judgment, arguing that the plaintiff's claims against them were precluded on the basis of the government contractor defense and that they were therefore entitled to judgment as a matter of law. The plaintiff opposed the motions claiming that the government contractor defense applies only to equipment purchased by the United States government for its own use and that, because the F-16B at issue had been purchased by the United States government for resale to the Egyptian government, the defense did not apply. In the alternative, the plaintiff contended that, even if the defense extended to the circumstances of its case, the defendants were not entitled to avoid liability.

In deciding the motions, the trial court relied on *Boyle* v. *United Technologies Corp.*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988), in which the United States Supreme Court addressed the liability of United States government contractors to third persons under

---

[8] The plaintiff successfully opposed the defendants' motion to dismiss on the ground of forum non conveniens. *Miller* v. *United Technologies Corp.*, 40 Conn. Sup. 451, 467, 515 A.2d 390 (1986).

state tort law. *Boyle* was a wrongful death action that was brought against an independent government contractor after a military helicopter it had supplied crashed into the ocean and, due to the defective design of the escape hatch, a pilot drowned. The United States Supreme Court concluded that suppliers of military equipment must be protected from state tort liability for design defects under certain circumstances based on the "discretionary function" exemption of the Federal Tort Claims Act.[9] The court determined that if tort liability were imposed on military suppliers of equipment, then they might decline to manufacture the design specified by the government. This would greatly inhibit the United States government's discretionary function of "balancing . . . many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." Id., 511. The court reasoned that "[t]he financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs." Id., 511–12. Accordingly, the court afforded immunity from state tort liability to government contractors that supply military equipment when a "uniquely federal interest" is in "significant conflict" with state law. Id., 505–507.

[9] Section 1346 (b) of title 28 of the United States Code provides that damages may be recovered from the United States for harm caused by the negligent or wrongful conduct of government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred. There is, however, an exception under 28 U.S.C. § 2680 (a) that precludes a party from recovering against the United States on "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

In so doing, the court first recognized that "a few areas, involving 'uniquely federal interests' . . . are so committed by the Constitution and laws of the United States to federal control that state law is preempted and replaced, where necessary, by federal law of a content prescribed . . . by the courts—so-called 'federal common law.' " (Citations omitted.) Id., 504. The court then examined two related areas that previously had been defined as uniquely federal interests: the "obligations to and rights of the United States under its contracts"; id.; and "the civil liability of federal officials for actions taken in the course of their duty." Id., 505. It concluded that "the reasons for considering these closely related areas to be of 'uniquely federal' interest apply as well to the civil liabilities arising out of the performance of federal procurement contracts." Id., 505–506. The court concluded, therefore, that the performance of a federal procurement contract involves a uniquely federal interest that justifies the displacement of state law by federal common law. Id., 507.

Such displacement may occur, however, only when a " 'significant conflict' exists between an identifiable federal policy or interest and the [operation] of state law' . . . ."[10] Id. In order to determine if such a con-

---

[10] The court explained the concept of significant conflict by example. "If . . . the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context. . . . [If, however,] the state-imposed duty of care that is the asserted basis of the contractor's liability . . . is precisely contrary to the duty imposed by the Government contract . . . [a conflict *may* exist, although even] in this sort of situation, it would be unreasonable to say that there is always a 'significant conflict' between the state law and a federal policy or interest." (Emphasis

flict exists, the court adopted a three part test. The court stated that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id., 512. The defense applies to negligence and strict product liability actions as well as to related state tort claims. *Skyline Air Service, Inc.* v. *G. L. Capps Co.*, 916 F.2d 977, 979 (5th Cir. 1990); *Smith* v. *Xerox Corp.*, 866 F.2d 135, 137 (5th Cir. 1989).

In applying *Boyle* to the motions for summary judgment, the trial court first concluded that the government contractor defense is not precluded by the subsequent sale of the aircraft by the United States government to a foreign government.[11] It based this decision on its determination that the same policy considerations that compelled the United States Supreme Court to recognize the government contractor defense in *Boyle* applied equally in this case.

The trial court also determined that the defendants had satisfied the three elements of the *Boyle* test. It stated that the first element of the test is satisfied if the government reviewed and approved a detailed set of specifications. The court concluded that, because the fuel pump was specifically designed for the military project and there was evidence of extensive govern-

added.) *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 509. If, for example, the government orders equipment from stock, by model number, with a defectively designed feature, "it is impossible to say that the Government has a significant interest in that particular feature." Id.

[11] The trial court determined that Connecticut law, not Egyptian law, applies to this case, except to the extent that state law is superseded by the government contractor defense. This determination has not been challenged on appeal.

ment involvement in the development, testing and modification of the fuel pump, the government had reasonably approved precise specifications.

The trial court then determined that the equipment conformed to the specifications that the government had approved. According to the trial court, the purpose of the second element is to disallow the immunity defense in cases involving a defectively manufactured product. The trial court emphasized, however, that the defense applies to cases involving design defects that the government had approved with full knowledge of the dangers of the design. The trial court characterized the cavitation erosion problem as such a design defect. The court was unpersuaded by the plaintiff's argument that the fuel pump was required to operate 600 hours before any maintenance had to be performed and that, because the pump in issue had failed after 230 hours of operation, it had failed to meet that specification. Thus, the court determined that the 600 maximum operating hours (MOH) was a "maintenance guideline" rather than a specification with which the defendants would have had to comply.

Finally, the trial court determined that the third element was satisfied because the government knew about the problems that were inherent in the design of the fuel pump and there was no evidence that additional information regarding such problems had been known to the contractor, yet not conveyed to the government. Instead, the court concluded that the cavitation erosion problem and the resulting danger of pump failure were well known to the government.

Additionally, the court noted that the defense applies equally to actions based on design defects and failure to warn, and recognized that there is no requirement under the government contractor defense that the contractor notify anyone other than the United States

government about any dangers inherent in the use of the equipment. The court also noted that the United States government had dictated the content of all pertinent manuals and literature and, therefore, had controlled all the information, including warnings, that was provided to foreign governments regarding the F-16 and its component parts. Having concluded that the defendants had satisfied all the elements of the government contractor defense, the trial court determined that they were immune from liability under state tort law and entitled to judgment as a matter of law. The court, therefore, granted the defendants' motions for summary judgment.

The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). The plaintiff raises several issues on appeal. First, the plaintiff argues that the trial court improperly applied the government contractor defense to this case because the defense does not apply to cases involving sales of products that are intended for use by a foreign government rather than by the United States government. Second, the plaintiff contends that, even if the trial court properly determined that the government contractor defense may apply to these circumstances, the trial court incorrectly concluded that the defendants complied with the requisites of the defense as a matter of law. Specifically, the plaintiff claims that there are genuine issues of material fact regarding: (1) whether the government approved reasonably precise specifications for the fuel pump; (2) whether the 600 MOH is a specification with which the pump was required, but failed, to comply; (3) whether the fuel pump failed to conform to other specifications that had been approved by the government; and (4) whether the defendants had failed to give the government adequate warning regarding the

dangers inherent in the use of the fuel pump. Finally, the plaintiff contends that the trial court incorrectly held that the government contractor defense precludes the plaintiff's failure to warn claim. The plaintiff argues that the defendants had a duty to warn the Egyptian government and that the trial court improperly found that the United States government controlled the content of all information that was provided to foreign governments regarding the F-16 air frame and component parts.

We substantially agree with the trial court's analyses and conclusions. We agree that the government contractor defense may apply to the circumstances of this case involving a supplier that has sold military equipment to the United States government for transfer to a foreign country. We also agree that the record supports the trial court's conclusion that the plaintiff's failure to warn claim is barred by the government contractor defense. We disagree, however, with the trial court's conclusion that there is no genuine issue of material fact regarding whether all three defendants satisfied the requirements of the *Boyle* test. Thus, although we agree with the trial court that the government approved reasonably detailed specifications and was made aware of all the risks inherent in the design of the fuel pump, we conclude that, with respect to United Technologies and Chandler-Evans, there exist genuine issues of material fact regarding whether the 600 MOH requirement was a specification with which those defendants failed to conform and whether the pump otherwise conformed to all other government approved specifications.

The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. "Practice Book § 384 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any [issue of] material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of [an issue of] material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citations omitted; internal quotation marks omitted.) *Water & Way Properties* v. *Colt's Mfg. Co.*, 230 Conn. 660, 664–65, 646 A.2d 143 (1994). "In evaluating the propriety of a summary judgment, we are confined to an examination of the pleadings and affidavits of the parties to determine whether (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Broadley* v. *Board of Education*, 229 Conn. 1, 4 n.7, 639 A.2d 502 (1994).

I

The plaintiff first claims that the government contractor defense does not protect government contractors who sell to the United States government equipment that is ultimately destined for sale to a foreign country. Thus, the plaintiff claims that the government contractor defense does not apply to this case because the sale of the F-16B was actually between the defendants and Egypt. The plaintiff suggests that the defense applies if the equipment is used directly and exclusively

by the United States government, but not if the United States government acts as a mere conduit for the sale of the equipment between the contractor and a foreign government, because only sales to the United States government involve "uniquely federal interests." The defendants contend that the defense may apply regardless of the intended destination of the military equipment. Although the parties disagree on the resolution of this issue, they do agree that it is a question of law that may properly be decided on a motion for summary judgment. Thus, we address this issue as a question of law and conclude that the application of the government contractor defense does not depend on the intended use or disposition of the military equipment.

The United States Supreme Court first recognized the government contractor defense in *Yearsley* v. *W. A. Ross Construction Co.*, 309 U.S. 18, 60 S. Ct. 413, 84 L. Ed. 554 (1940), in which the court, relying on agency theory, barred suits against government contractors performing public works projects. The defense was eventually construed to cover product liability actions brought by United States government employees against independent government contractors. *McKay* v. *Rockwell International Corp.*, 704 F.2d 444 (9th Cir. 1983), cert. denied, 464 U.S. 1043, 104 S. Ct. 711, 79 L. Ed. 2d 175 (1984); *In re Agent Orange Product Liability Litigation*, 534 F. Sup. 1046 (E.D.N.Y. 1982). These cases recognized the defense as an extension of the United States government's sovereign immunity from tort liability on claims brought by government employees who had been injured in the course of their employment. See *Stencel Aero Engineering Corp.* v. *United States*, 431 U.S. 666, 97 S. Ct. 2054, 52 L. Ed. 2d 665 (1977); *Feres* v. *United States*, 340 U.S. 135, 71 S. Ct. 153, 95 L. Ed. 152 (1950). Most recently, in *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 500, the United States Supreme Court recog-

nized that, under certain circumstances, the government contractor defense may preclude product liability actions for design defects brought by third parties against suppliers of military equipment.

The government contractor defense is intended to protect the discretionary decisions of the United States government from judicial scrutiny and to permit the government to acquire from its independent contractors equipment of any specifications that it requires. "In the military context, this immunity serves the . . . important purpose of shielding sensitive military decisions from scrutiny by the judiciary, the branch of government least competent to review them. Application of ordinary tort law to military design and procurement decisions is not appropriate, for the government is required by the exigencies of our defense effort to push technology towards its limits and thereby incur risks beyond those that would be acceptable for ordinary consumer goods." (Internal quotation marks omitted.) *Harduvel* v. *General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989), cert. denied, 494 U.S. 1030, 110 S. Ct. 1479, 108 L. Ed. 2d 615 (1990); *Tozer* v. *LTV Corp.*, 792 F.2d 403, 406 (4th Cir. 1986), cert. denied, 487 U.S. 1233, 108 S. Ct. 2897, 101 L. Ed. 2d 931 (1988). Furthermore, if such contractors were liable for damages resulting from design requirements imposed on them by the government, they might refuse to manufacture products that would put them at risk. In the alternative, the costs associated with any judgments against such contractors and the resulting increase in insurance costs would ultimately be passed on to the United States government. *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 511–12.[12]

---

[12] We note that the government contractor defense applies to subcontractors as well as contractors and, therefore, may extend to Chandler-Evans. See, e.g., *Ramey* v. *Martin-Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989). In addition, "[t]he fact that . . . a subcontractor [deals with

748

We conclude for several reasons that the policy considerations that precipitated the creation of the government contractor defense apply equally to the case before us. First, the United States government's ultimate use or disposition of military equipment has never been relevant to the application of the government contractor defense. See, e.g., *Skyline Air Service, Inc.* v. *G. L. Capps Co.*, supra, 916 F.2d 977. The rule articulated in *Boyle* applies to "federal procurement contracts" for military equipment. *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 506. The court did not limit or precondition the defense according to the intended use of the equipment, but determined generally that the procurement of equipment by the United States government is an area of uniquely federal interest. Regardless of whether the United States government intends to include aircraft in its own Air Force fleet, use it as an instrument of negotiation in matters of international diplomacy or make it a gift to our allies, the government contractor defense ensures that the government can dictate precisely what it requires for *any* purpose and that the contractor will not be held accountable for the government's specifications. Moreover, judicial inquiry into the United States government's intended use or disposition of military equipment would be an improper intrusion into the discretion of the executive and legislative branches of the federal government. See *Jamil* v. *Secretary of Defense*, 910 F.2d 1203, 1205–1206 (4th Cir. 1990) (judiciary may not intrude upon authority of executive branch in military matters absent specific congressional authorization); *Kreis* v. *Secretary of the Air Force*, 866 F.2d 1508, 1511 (D.C. Cir 1989) (constitution vests complex, subtle and professional decisions as to equipping military force exclusively in legislative and executive branches).

the contractor], rather than directly with the government, is not sufficient to defeat [the defense]." *Maguire* v. *Hughes Aircraft Corp.*, 725 F. Sup. 821, 825 (D.N.J. 1989), aff'd, 912 F.2d 67 (3d Cir. 1990).

Second, if the government contractor defense applied only to contracts for equipment destined for use directly and exclusively by the United States government, contractors would forseeably either attempt to make an equally untenable inquiry into the purpose of each contract or refuse to manufacture products according to the government's specifications. This likely would undermine the effectiveness of the defense because the United States government may not always know how it intends to use military equipment and, even when it does know, it may not choose to reveal such information. Extending the defense to government contractors regardless of whether the equipment is destined for a foreign government alleviates the need for such an inquiry and permits the contractor to comply with the government's requirements without hesitation.

Third, it is probable that the costs of any increased liability to the contractor would eventually be paid by the United States government. The plaintiff argues, nonetheless, that all the costs of the equipment in this case were passed on to the Egyptian government and that future increases due to greater exposure to liability would also be passed on to ultimate purchasers. We are unpersuaded. If the government contractor defense were unavailable in cases involving military equipment destined for foreign countries, higher insurance premiums due to contingent liability would undoubtedly impact equipment prices with the result that the government would pay a higher price for the equipment purchased for its own use. Also, there is no evidence that foreign governments always pay the full cost of equipment provided to them by the United States government.

Finally, we note that the defense has been applied to preclude claims against government contractors for incidents that had occurred after the product had been transferred by the United States government to a third

party. See, e.g., *Glassco* v. *Miller Equipment Co.*, 966 F.2d 641 (11th Cir. 1992) (government contractor defense precludes claim by nongovernmental owner of product designed for military); *Skyline Air Service, Inc.* v. *G. L. Capps Co.*, supra, 916 F.2d 977 (nongovernmental owner of military surplus helicopter precluded from suit against manufacturer); *Garner* v. *Santoro*, 865 F.2d 629 (5th Cir. 1989) (government contractor defense precludes claims by civilian user of military product). We conclude, therefore, that the government contractor defense applies to all contractors that satisfy the *Boyle* test, regardless of the intended destination of the military equipment.

## II

We next consider the plaintiff's claim that the trial court improperly concluded that there was no genuine issue of material fact with respect to the applicability of the government contractor defense and, therefore, that the trial court improperly rendered judgment for the defendants as a matter of law. The plaintiff first contends that the United States government did not approve reasonably precise specifications for the MFP-330 fuel pump. Alternatively, the plaintiff argues that, if the government did approve such specifications, then the 600 MOH requirement is a reasonably precise specification with which the pump failed to comply. Further, the plaintiff argues that there remain genuine issues of material fact concerning whether the defendants complied with various other reasonably precise specifications. Finally, the plaintiff claims that there are questions of fact regarding whether the defendants properly warned the United States government of the cavitation erosion problems inherent in the IVSP fuel pump configuration.

In response, the defendants argue that the United States government did approve reasonably precise

specifications. As evidence of the government's development of reasonably precise specifications, the defendants emphasize that the government was represented throughout the lengthy development process and had assigned a specific individual employee to the fuel pump project. The government had also insisted on a multilevel approval procedure for every phase of the aircraft's development. Relying on this involvement, the defendants contend that the government approved reasonably precise specifications for the aircraft and all of its components, including the engine and the fuel pump. Similarly, on the basis of the government's close and continuing scrutiny of the project, the defendants claim that it was aware of all the problems with the MFP-330 fuel pump. Finally, the defendants argue that the trial court correctly characterized the 600 MOH requirement as a precatory maintenance guideline rather than as a "specification" within the meaning of *Boyle*.

We agree with the defendants that the United States government approved reasonably precise specifications for the aircraft and its components and that the government knew of the problems with the MFP-330. We disagree, however, with the trial court's conclusion that the 600 MOH requirement was, as a matter of law, a precatory maintenance guideline. Rather, we conclude that the character of the MOH requirement is unclear and, therefore, that it remains a proper question for the fact finder.

Practice Book § 384 provides that rendition of a summary judgment is appropriate "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is appropriate only if a fair and reasonable person could conclude only one way. *Haesche* v. *Kissner*, 229 Conn. 213, 216, 640 A.2d 89 (1994). "The movant

must show that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . [A] summary disposition . . . should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party." (Citations omitted; internal quotation marks omitted.) *Batick* v. *Seymour*, 186 Conn. 632, 647–48, 443 A.2d 471 (1982). "[A] directed verdict may be rendered only where, on the evidence *viewed in the light most favorable to the nonmovant,* the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Emphasis added.) *United Oil Co.* v. *Urban Redevelopment Commission,* 158 Conn. 364, 380, 260 A.2d 596 (1969). The facts as well as the evidence must be viewed in the light most favorable to the nonmoving party. *Rawling* v. *New Haven,* 206 Conn. 100, 104, 537 A.2d 439 (1988). The burden of proof is on the moving party and the standards of summary judgment are strictly and forcefully applied. *D.H.R. Construction Co.* v. *Donnelly,* 180 Conn. 430, 434, 429 A.2d 908 (1980).

We note that summary judgment is not well suited to the disposal of complex cases; *United Oil Co.* v. *Urban Redevelopment Commission,* supra, 158 Conn. 375; and that this case presents an extraordinarily technical and multifarious factual labyrinth. Thus, in order to decide whether the trial court improperly concluded as a matter of law that the three prongs of *Boyle* were satisfied, we must go deeper into the labyrinth to find the Minotaur.

The process that led to the development of the MFP-330 fuel pump was described at length during pretrial discovery. Several of the deponents in this case were past or then present government employees who had been involved in purchasing the F-15 or the F-16 aircraft, and those persons explained the purchasing

process.[13] The Air Force initiates purchases of new fighter jet aircraft only after it first ascertains the operational requirements, such as combat performance and flight speed, with which the new aircraft must comply. After the Air Force command has approved the operational requirements and funding has been obtained from Congress, the project is assigned to the appropriate research and development agency for execution. The operational requirements are then translated into technical requirements. These requirements are not stated in technically specific terms, but consist of a list of required goals that the product must meet. The government does not direct how those goals are to be met.

Separate requests for proposals on the air frame and its subsystems, including the engine, are then sent by the systems program office[14] to potential suppliers. Although the requests may include detailed requirements that are peculiar to the particular mission the aircraft is to serve, the Air Force relies on the suppliers to provide in their proposals detailed technical specifications of the proposed aircraft. In crafting their proposals, suppliers of engines look to a general guide for military specifications on engines, which is a known

[13] Although this case involves the failure of an F100-PW-200 engine in an F-16B aircraft, the specifications for the fuel pump were defined during the course of the development of the F-15. See footnote 7. Accordingly, the testing and approval procedures for the F-15 project are relevant to our analysis of whether the government approved reasonably precise specifications for the pump. Therefore, we must discuss the development process of both aircraft and, in the interest of clarity and simplicity, we incorporate the approval processes of both the F-15 and F-16 aircraft into a single description. There is no evidence that the government departed from its standard procedure for either aircraft.

[14] A systems program office was described by James Bair, Air Force staff engineer of the F-16 systems program office, as "part of the fundamental organizational structure of the aeronautical systems division. Program offices acquire and develop the aeronautical systems which we then turn over to the operational forces to use." There were separate systems program offices for the F-15 aircraft, F-16 aircraft and the F100 series engine.

reference within the industry and is not part of the request for proposal. After the suppliers submit the proposals, a selection process commences in order to evaluate thoroughly the proposals.

Competitive engine development contracts for the construction of prototypes are awarded to the contractors that present meritorious proposals. After the Air Force engineering teams evaluate the performance of the prototypes, the Secretary of the Air Force decides which supplier will be awarded the contract for the development of the engine. The final contract for the development of the engine contains a section of specifications, including detailed requirements for the engine's performance capacities and the manner in which the contractor must demonstrate that these requirements have been met. Before production may begin, the contractor must demonstrate that the engine meets the requirements. Often the requirements, or the tests that are intended to demonstrate that the requirements have been met, are revised during the development process.

The Air Force used this procedure when it contracted, in the 1960s, for the twin engine F-15 fighter aircraft for which the MFP-330 fuel pump was developed. Only two suppliers submitted proposals for the engine, and Pratt & Whitney was awarded the contract. Subsequently, during the early 1970s, the Air Force identified an operational requirement for a lightweight tactical fighter aircraft, which was eventually designated as the single engine F-16 and developed under a technical process similar to that used for the F-15. The government was integrally involved in the development processes, through the systems program offices, of the F-15 aircraft, the F-16 aircraft and the F100 series engine.

Each systems program office contributed to the development of detailed specifications for the components of the aircraft. The F-15 and F-16 systems program offices were responsible for the air frame and the integration of the subsystems, including the engine, into the air frame. The engine systems program office was responsible for the acquisition and development of the engine and its component parts. The engine and aircraft systems program offices worked together closely on the development of the engine, and any changes to the engine or its component parts were considered by both offices. In addition, the engine systems program office included a configuration control board that reviewed all the component parts of the engine, including the fuel pump, and made recommendations to the configuration control boards of the F-15 and F-16 systems program offices.[15]

The contractors were required to make presentations to the government, and receive its approval, at various stages during the development process. In addition, the Air Force maintained representative offices at each contractor's manufacturing plant to supervise the execution of ongoing development contracts. After the government approved each F100 engine and accepted delivery, it delivered the engines to General Dynamics for integration into the air frames. After the production of each integrated air frame, the government would inspect, approve and accept that aircraft. The government manifested its acceptance of each aircraft by signing a department of defense material inspection and receiving report, form DD-250 (DD-250).

---

[15] The Egyptian government had a representative on the configuration control board of the F-16 systems program office and was therefore involved in the ultimate decisions regarding the engine. As a member of the F-16 systems program office, the Egyptian representative would have been required to authorize the engineering change proposal for the incorporation of the modulated bypass fuel pump. Egypt was also a participant in the component improvement program to develop a more durable fuel pump.

The prototype of the F100 series engine incorporated a gear driven fuel pump that did not meet government requirements. Thereafter, in 1970, Pratt & Whitney contracted with Chandler-Evans for the design, development and manufacture of a variable displacement vane type main fuel pump that would conform to the engine requirements. See footnote 2. In short, the project required a new type of fuel pump technology. The pump had to be relatively lightweight, operate at higher RPMs and accept a higher temperature from the engine than pumps that were available at the time.

In 1971, when the MFP-330 fuel pump was still in the early stages of development, the government assigned Kenneth E. Binns, an engineer, to the F-15 project. Binns was particularly knowledgeable about state-of-the-art high speed vane pump technology. Several fuel pump prototypes were developed and tested by Chandler-Evans. When the production model was ready for testing, the engine systems program office and Binns rejected the first qualification test plan for the fuel pump that had been submitted by Pratt & Whitney, and required Pratt & Whitney to revise the plan.

The government subsequently approved a revised test plan, and it was implemented in subsequent bench qualification tests.[16] Because a pump must be redesigned and requalified if it does not meet the requirements of the bench qualification test, the prototype of the MFP-330, which failed the first bench test, had to be altered according to the requirements imposed by

---

[16] During a bench qualification test, the contractor simulates operational conditions and operates the equipment to be tested under these conditions for a predetermined and often lengthy period of time. The performance of the equipment is evaluated both during and after its operation. The government had to approve the qualification test plan and the results of the bench qualification test implementing the plan as part of the overall approval process for the fuel pump.

the government and Pratt & Whitney. Subsequent to the redesign, the government accepted the final qualifying bench test results.

Also, the fully assembled engine, which included the fuel pump, was subjected to extensive testing. In 1974, the fuel pump was accepted for the production engine, and on June 11, 1974, the government approved the first production F100 engine that incorporated the MFP-330. The fuel pump configuration could not be altered for any reason without a detailed engineering change proposal approved by the engine systems program office and the aircraft systems program office.

As an integral part of the F100 engine, the MFP-330 actually functioned as more than a pump. George Jahrstorfer, a Chandler-Evans engineer who assisted with the development of the MFP-330, described the pump as "a lot more than a pump. It's a fuel controller. It's intimately involved with the operation of the engine because . . . about 50 percent of it is a pump and the function of it is part of fuel metering so it's a lot more complex than the basic pump." Therefore, the MFP-330 vane pump was unique, and it was by far the most sophisticated pump that Chandler-Evans had ever manufactured.

Even after the MFP-330 fuel pump had been approved and accepted, it was particularly susceptible to cavitation erosion, and the government wanted a more durable pump with a longer operational life. In 1975, the government funded a "component improvement program" for this purpose. The component improvement program was described by Binns and Jahrstorfer as an effort to extend the 600 MOH for the main fuel pump. The government wanted a fuel pump that was operationally reliable for 1000 to 1500 hours between inspections or overhauls.

Several configurations were developed pursuant to the component improvement program for the MFP-330.[17] At one point during this improvement program, the F100 engines were retrofitted with a discharge vented side plate (DVSP) configuration. After this version of the pump was in the field, however, serious cavitation erosion problems arose and the DVSP pumps were immediately retrofitted back to the IVSP configuration. The next viable design that was developed under the component improvement program was the modulated bypass configuration. On March 6, 1978, the government revised the MFP-330 fuel pump component improvement program to continue the development of the modulated bypass MFP-330 fuel pump configuration and to extend the MOH of the MFP-330 to 1000 hours. This design was subjected to a much more rigorous substantiation program than the DVSP to ensure that there would not be a repeat of the DVSP problems. This configuration eventually conformed to the desired MOH of 1000 hours and replaced the IVSP configuration, but not until 1983.[18]

---

[17] Because the F-16 is a single engine aircraft, it is critical that the fuel pump function adequately. One of the solutions proposed by Pratt & Whitney was a dual pump system, but the government rejected that idea.

[18] We note that, during deposition testimony, Paul Baxter, the systems program office engineer in charge of the durability aspects of the F100 engine, and James Crouch, a project engineer for the F100 engine, described the desired MOH of 1000 to 1500 as a "goal." If it were clear that the MOH was merely a desired goal, we would be compelled to agree with the trial court and conclude that, as a matter of law, the MOH is not a *Boyle* specification. This testimony, however, was in the context of the period before the modulated bypass pump had been developed or approved and, therefore, before the MOH had become 1000. The MOH was always 600 during the period that the government funded the development of a more durable pump that would achieve 1000 MOH. Because 1000 MOH was only a "goal" during the period in which it was not yet attained, we do not believe this characterization is inconsistent with our conclusion that the 600 MOH may be a specification within the meaning of *Boyle*. Furthermore, the 600 MOH was never referred to by any of the multitudinous deponents as a desired "goal."

The F-16B aircraft that is the subject of this litigation contained an IVSP configured MFP-330 fuel pump with an MOH of 600. This aircraft and all of its component parts were manufactured and accepted according to the same review and approval process as that used for all other F-16 aircraft that were manufactured for the United States government. The Air Force accepted delivery of the subject F-16B on March 12, 1982, and, thereafter, delivered it to the Egyptian government.

In May, 1982, an IVSP vane pump installed in an Israeli owned F-16 failed to start on the runway, after only 341 hours of operation, due to heavy cavitation erosion damage. Subsequently, forty-one pumps were evaluated and, in addition to the failed pump in the Israeli F-16, twenty-one other pumps were determined to have severe cavitation erosion damage. On January 10, 1983, ten days before the fatal crash in Egypt, the Air Force issued an order requiring all MFP-330 fuel pumps to be retrofitted with the modulated bypass configuration during each aircraft's next overhaul.

A

We first address whether the trial court properly concluded that there was no genuine issue of material fact with respect to the first prong of *Boyle*. The first element of the *Boyle* test requires the defendants to show that the United States government had approved reasonably precise contract specifications. *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 512. This requirement, in combination with the second element, is intended to "assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated—i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." Id. The government must have either designed or proposed the

allegedly defective feature, or approved the design after active consideration. *Lewis* v. *Babcock Industries, Inc.*, 985 F.2d 83, 86–87 (2d Cir.), cert. denied, 509 U.S. 924, 113 S. Ct. 3041, 125 L. Ed. 2d 727 (1993). The approval must constitute more than a mere "rubber stamp" by the government. *Trevino* v. *General Dynamics Corp.*, 865 F.2d 1474, 1486 (5th Cir.), reh. denied en banc, 876 F.2d 1154, cert. denied, 493 U.S. 935, 110 S. Ct. 327, 107 L. Ed. 2d 317 (1989). Rather, it must be the result of a " 'continuous back and forth' " between the contractors and the government. *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1320.

1

The plaintiff first argues that the United States government provided the contractors with *no* specifications within the meaning of the first prong of the *Boyle* test and, accordingly, that the trial court improperly determined that the United States government, as a matter of law, had approved reasonably precise contract specifications. The trial court determined that the main fuel pump in the F-16 engine was specially designed for the military under the auspices of the United States government. The court further concluded that the government gave its informed approval of the MFP-330 IVSP configured fuel pump after actively participating in the development, testing and modification of the pump. Therefore, the trial court determined that the government had approved reasonably precise specifications. We agree with the trial court's conclusion.

Both the Pratt & Whitney F100 series engine and the Chandler-Evans MFP-330 fuel pump were developed specifically for the F-15 fighter jet aircraft, a piece of equipment that was for sale exclusively to the United States government. The MFP-330 IVSP fuel pump was a state-of-the-art design developed to meet the unique

requirements of the F-15 aircraft. The pump was subjected to a multifaceted government approval process, and the government assigned its own engineer, Binns, to review the fuel pump development project because of his expertise and experience with vane type pumps. The development of the F-15 and F-16 aircraft, as well as the F100 engine, was overseen by the respective government systems program offices, configuration control boards and Air Force plant representatives.

Similarly, the IVSP design did not merely receive a summary "rubber stamp" of approval from the United States government. On the contrary, the government exercised its discretion when it rejected the gear driven fuel pump that had been incorporated into the F-15 prototype and when it rejected Pratt & Whitney's original proposed qualification tests for the fuel pump. The government also required design alterations on the IVSP after the initial bench qualification test. Each of the defendants' products was given final and separate approval by the government after extensive testing. Both flight and ground inspections were completed for each F-16 by the Air Force plant representative office at General Dynamics, and, upon approval of each aircraft, the government executed a DD-250 certifying that the aircraft conformed to all applicable specifications.

In addition, Binns participated in the decision regarding the acceptable MOH. He described during his deposition testimony how the MOH had been determined. "[I]n order to establish MOH, we had to tear down the units from the field at certain hours. In other words, we had anywhere from three to five pumps to come in at 300 hours to look at them, determine the condition of the pump, and determine if we could extend the MOH. We would put that particular hardware on the bench to run for an additional length, the next 300 hours or 100 hours, look at it again, and that's how we

extended it." Both the contractors and the government were involved in these inspections, and all of them agreed to the MOH of 600 for the MFP-330 fuel pump.

Although the configuration of the pump was eventually altered and the MOH extended to 1000, this is not dispositive of the issue of the government's approval of the IVSP configuration with an MOH of 600. The government's approval of the IVSP configuration had always been in effect during its period of use. Admittedly, the government considered several alternative design configurations and eventually refitted the MFP-330 fuel pumps with the modulated bypass configuration. The fact that an improved design was under consideration or that the modulated bypass configuration was also approved for use does not, however, preclude the government contractor defense. See, e.g., *Lewis* v. *Babcock Industries, Inc.*, supra, 985 F.2d 88; *Ramey* v. *Martin-Baker Aircraft Co.*, 874 F.2d 946, 950–51 (4th Cir. 1989). We conclude, therefore, that the trial court correctly determined that there was no genuine issue of material fact over whether the government had approved reasonably precise specifications for each of the defendants' products.[19]

2

We disagree, however, with the trial court's determination that, as a matter of law, the MOH requirement was a mere maintenance guideline rather than a specification and that, consequently, United Technologies and Chandler-Evans complied with all the government's specifications. After a thorough review of the testimony in this case, we conclude that the character of the "maximum operating hours" requirement is unclear.

---

[19] Additionally, we note that in *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1320, the court specifically determined that, in respect to General Dynamics' limited role in the project, the F-16 design process satisfies the first element of *Boyle* as a matter of law.

*Boyle* did not define what type of specifications the government contractor defense is intended to address. The only requirement under *Boyle* is that the specification in issue must have been approved by the government with reasonable precision. *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 512. This element is intended to afford immunity from state tort liability to a government contractor that manufactures a product with a design defect that nonetheless complies with government specifications. *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1321.

Cases that have examined whether a particular requirement was a reasonably precise specification under *Boyle* do not provide any substantial guidance in this case. The reasonably precise specifications that the government must approve and with which a contractor must comply have been described as "quantitative specifications that detail particular requirements to be met in manufacturing military hardware." *Kleemann* v. *McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir. 1989), cert. denied, 495 U.S. 953, 110 S. Ct. 2219, 109 L. Ed. 2d 545 (1990).[20] Qualitative remarks, precatory goals and safety guidelines are not the type of reasonably precise quantitative specifications to which the *Boyle* test refers. *Sundstrom* v. *McDonnell Douglas Corp.*, 816 F. Sup. 577, 584–85 (N.D. Cal. 1992);[21] see

---

[20] In *Kleemann* v. *McDonnell Douglas Corp.*, supra, 890 F.2d 698, the specification at issue was a general requirement that the landing gear of the aircraft "be strong enough to withstand normal landing loads without bending, that it remain locked after extension until unlocked from the cockpit, and that any failure of the landing gear not result in uncontrollable movement of the airplane." The court determined that this was a general qualitative requirement and not a precise quantitative specification. Id., 702.

[21] In *Sundstrom* v. *McDonnell Douglas Corp.*, supra, 816 F. Sup. 584, the plaintiff alleged, among other things, that the defendant had not complied with the following specification: "The [ejection] seat system shall be free of any projections or sharp edges which could snag, jam, or damage clothing and equipment, injure the seat occupant or maintenance personnel, foul personal equipment, jeopardize operation of seat components, or interfere with recov-

*In re Aircraft Crash Litigation Frederick, Maryland,*
752 F. Sup. 1326 (S.D. Ohio 1990).[22]

In this case, many different types of specifications
were generated during the process of developing the
new military equipment. The operational specifications
determined by the government were transformed by
the contractor into design specifications, which were
then converted into contract specifications after a
period of evaluation and negotiation between the con-
tractors and the government. These specifications were
thereafter subject to revision through the implemen-
tation of engineering change proposals. As the develop-
ment process progressed and the equipment became
more defined, the parties determined performance,
durability and maintenance specifications. Therefore,
the final product was the result of an ever-changing
interactive process of defining various specifications.

The process was particularly fluid for the develop-
ment of the fuel pump. The MFP-330 IVSP fuel pump
was a new technological development that had been

ery parachute operation." The court compared this specification to the land-
ing gear specification in *Kleemann* and determined that the ejection seat
requirements were similarly qualitative and general. Id., 584.

[22] In *In re Aircraft Crash Litigation Frederick, Maryland,* supra, 752
F. Sup. 1326, the plaintiff argued that the defendants had failed to comply
with a series of specifications that pertained to a flight control system. The
court gave as an example of the disputed specifications the "Amended State-
ment of Work, Project Definition Phase, Section 1.7 which, as is true of
the other documents relied upon by Plaintiffs, became part of [the] con-
tract with the Air Force:

### Characteristics

The A/RIA System shall be designed to meet all of the varied charac-
teristics and performance requirements specified. The requirements of the
A/RIA/ALOTS system may require aerodynamic refinements heretofore
not incorporated in this type(s) of aircraft. Primary emphasis shall be placed
in obtaining the best control and stability with minimum overall degrada-
tion of existing C-135 performance characteristics." Id., 1360 n.40. The
court determined that these requirements were not *Boyle* specifications.
Id., 1360.

created specifically for the F100 series engine and according to Air Force performance requirements. The initial request for proposals that was issued by the government to the contractors did not include detailed specifications on the equipment, but instead only informed the suppliers of what the equipment was required to do. The proposals that were submitted in response to the request included more detailed specifications, but they apparently were far from final. In sum, the MFP-330 IVSP fuel pump required new technology that was developed over a period of years, and it is reasonable to conclude that the specifications for the pump evolved as it developed. Although it is not clear precisely when the MOH was determined, it appears to have been decided late in the development process. It was fixed by the consensus of the government and the contractors, and the government had the final power of approval.

After evaluating the evidence before us and in light of other decisions, we conclude that the MOH can be interpreted as more than a mere maintenance guideline or qualitative safety goal. The F-15 and F-16 aircraft required a faster and lighter weight pump than the sturdier gear pump. Therefore, the government accepted the IVSP vane pump even though its relatively delicate working parts were more susceptible to cavitation erosion. That approval was given, however, with the specific understanding that the pump would have an MOH of 600 hours. Furthermore, the record discloses that, although the government approved the pump at an MOH of 600 hours, it was not satisfied with the pump's durability. Accordingly, the government funded a component improvement program specifically to develop a fuel pump that would comply with the technical requirements and have an MOH of between 1000 and 1500. This continued research and development

shows that the government recognized the minimum capabilities of the MFP-330 and wanted to increase its minimum durability.

The defendants argue that if the government has knowledge that a product will not consistently comply with a quantitative requirement and, nonetheless, approves the production of the product, such a requirement is a "desirable goal" and not a "precise specification." See *Landgraf* v. *McDonnell Douglas Helicopter Co.*, 993 F.2d 558 (6th Cir.), cert. denied, 510 U.S. 993, 114 S. Ct. 553, 126 L. Ed. 2d 454 (1993). We recognize the distinction, but disagree with the defendants that they benefit from it. In *Landgraf*, a main rotor blade on a helicopter dropped sharply during an emergency landing due to power failure, struck the tail boom and severed it. The helicopter crashed and the plaintiff's decedent was killed. The government's structural design requirements specified that " 'the clearance between main rotor blades and other parts of the helicopter shall not be less than 9 inches, and preferably 12 inches . . . .' " Id., 561. During tests that had been performed by the contractor several years before the subject crash, it had been observed, however, that in such an emergency landing the rotor had a clearance of as little as three inches. Further, the contractor had informed the government that the rotor might strike the tail boom under such circumstances. The government chose not to make any changes to the design of the rotor and continued to accept delivery with the knowledge of this potential problem. The court determined that, although this otherwise would be specification language within the context of tort or contract principles, the nine inch requirement was a general and generic criteria "that refers to all types of helicopters, not this specific model," and that it was a precatory statement of the Army's goal in normal flying conditions. Id. Furthermore, the court reasoned

that "[a]lthough [the contractor] reported to the Army that there was a clearance of as little as three inches . . . not the 9 to 12 inches mentioned in MIL-S-8698—the Army ordered no further changes in the configuration. This is strong evidence that the Army considered the contents of MIL-S-8698 as stating a desirable goal and a recommended way of achieving it, but not precise specifications." Id., 564. Therefore, because the court determined that the helicopter had otherwise conformed to the government's reasonably precise specifications, it concluded that the defendant was entitled to immunity from the plaintiff's claim under the government contractor defense.

*Landgraf,* however, can be distinguished from the case before us. First, the specifications at issue are not analogous. In *Landgraf,* the court determined that "the Army's actions throughout the procurement process support the defendant's claim that the provisions [for the main rotor blade clearance] did not govern the design of [the] model OH-6A [helicopter]." Id. 562. In the case before us, there is ample evidence that the MOH was carefully determined specifically for the MFP-330 and that the MOH requirement governed the design of the pump. Indeed, the MOH is one of the most precise requirements pertaining to the fuel pump that the government specified. Furthermore, the require-ment of "not . . . less than 9 inches, and preferably 12 inches" may be reasonably construed as less pre-cise than "600 MOH."

Second, after the IVSP failure in Israel, the govern-ment reacted immediately by requiring the pumps to be inspected after 300 hours of operation,[23] a point well before the time when the failure had occurred, and by replacing them with the newly developed modulated

[23] Samuel Arline, a senior engineer in charge of pump hardware for Pratt & Whitney, testified that the temporary alteration of the inspection require-ments did not equate to a change in the 600 MOH.

bypass pumps on an expedited basis. These changes were implemented only in Israel. The results of the investigation of the failure showed that it was caused by excessive cavitation damage due to the Israeli mission profiles and the type of jet fuel that was used there. It is reasonable to assume that action was taken only in Israel because the government believed the cause of the problem to be localized. Thus, in contrast to *Landgraf*, it cannot be said in this case that the government acquiesced to the defect. Moreover, there is no evidence that the government or the defendants expected MFP-330 pumps to have an MOH of less than 600 hours. On the contrary, the government acquiesced to the 600 MOH although it wanted, and was eventually provided with, a fuel pump with an MOH of 1000. Also, the government approved the 600 MOH requirement specifically for the IVSP configured MFP-330 fuel pump. Thus, when the subject aircraft was built, the government's desire to have the pump attain an MOH in excess of 1000 could be characterized as a mere "desirable goal," but its prior approval of the 600 MOH could be characterized as a specification.

The significance of the MOH was explained during the testimony of several engineers. The pump was to be operated for up to 600 hours before being pulled and overhauled. This limitation was determined jointly by the government and the contractors although the government had the final decision-making authority. The MOH was conservatively determined on the single engine F-16, for safety reasons.[24] There was no concern regarding flight safety as long as the pump was

---

[24] Marvin Bryant, United States Air Force program manager for the F100 engine, testified to the following during his deposition of April 29, 1992:

"Q. And what was the nature, what were the natures of your duties and responsibilities with respect to the MOH for the MFP-330?

"A. My job was to consider the recommendations from the contractors and from the in-house Air Force engineers and logistics regarding the num-

operating within the approved MOH.[25] Therefore, it is reasonable to assume that users of the F-16 relied upon the MOH to determine whether an aircraft was safe to fly. Consequently, in addition to being the maximum operating hours a pump was to run before being pulled for inspection and maintenance, a reasonable fact finder could conclude that the MOH also signified the minimum number of safe operating hours before which the fuel pump would not need to be overhauled in order to ensure against engine failure.

Also, the defendants argue that the MOH cannot be a specification because it was determined late in the development of the MFP-330 fuel pump. We disagree that the timing of its development is dispositive. Faced

---

ber of hours they thought that it would be safe to operate before it would need to be reviewed for overhaul.

"Q. So to what extent, if at all, was any margin of safety built into the MOH, set at a given time for the main fuel pump?

"A. The F-16, being a single engine airplane, we were very cautious about anything that would affect its safety, so the numbers of hours that we would allow the components to operate on the F-16 were actually less than on the F-15. . . .

"Q. What information did you utilize with respect to determining the MOH for the . . . MFP-330 main fuel pump?

"A. The information that was normally available included experience from ground tests, experience from flight tests and experience from field service tests and experience from operation in the F-15. . . . I think at this time we were also receiving from the contractors a safety analysis that predicted the level of safety that you could expect from the change."

[25] Binns, the government engineer who supervised the development of the MFP-330, responded to questions regarding the MOH during his deposition of April 28, 1992, as follows:

"Q. The MOH value number of hours was set, was it not, such that when the fuel pump would reach that number of hours it would not have failed?

"A. Correct.

"Q. And the MOH was at the time at a particular number of hours purposefully to require an inspection or overhaul or some type of maintenance item before a pump was believed to be in danger of failing, is that correct?

"A. Right.

"Q. Consequently, there was no concern of flight safety if a main fuel pump were operating within its approved MOH, is that correct?

"A. Correct."

with an issue similar to the one before us, the court in *Maguire* v. *Hughes Aircraft Corp.*, 725 F. Sup. 821 (D.N.J. 1989), aff'd, 912 F.2d 67 (3d Cir. 1990), found to be a specification within the meaning of *Boyle* the service life of a component that had been installed in a helicopter after an initially designed component had already been operated in the field. The plaintiff, a national guardsman, alleged that he had been injured during an emergency landing when the military helicopter that he had been piloting experienced an engine failure. There was evidence that the engine failure had been caused by a defective bearing that had not been part of the original engine design, but had been incorporated later. Id., 822. Although the plaintiff conceded that the government participated actively in the original engine design, he nevertheless argued that, because the bearing was incorporated subsequent to the development of the overall design and without the active participation of the government, the bearing failed to satisfy the first prong of the *Boyle* test. Alternatively, the plaintiff alleged that the bearing did not comply with the specification included in the "technical data report," which specified that the bearing would have a "B10 life of 1870 hours." This meant that 10 percent of the bearings were calculated to fail within 1870 hours of operation. Id., 824. The engine in the plaintiff's helicopter had failed after only 711 hours of operation. The defendants contended, among other things, that the life of the bearing was mere "technical information" rather than a specification and that the equipment otherwise conformed to the specifications the government had approved. Id.

The court rejected the plaintiff's argument that the first prong of *Boyle* was not satisfied because the approval and incorporation of the part occurred after the original design had been completed and the equipment was operational. The court concluded that the

approval requirement applies only to the "overall design" and not to every subsequent detail, and determined that the bearing was part of the overall design that had received government approval. According to *Maguire*, therefore, the time at which the government incorporates a requirement into the initial design is irrelevant if the requirement relates to the overall design in which the government actively participated. Similarly, in this case, the time at which the MOH was determined may also be considered irrelevant if it was part of the overall design. Thus, even if the MOH was approved after the design phase of the project, it may still be considered a reasonably precise specification that the government approved. See *Lewis* v. *Babcock Industries, Inc.*, supra, 985 F.2d 89 (*Boyle* test may be satisfied after design phase has been completed).

*Maguire* is also significant to this case because that court treated the service life of the bearing as a specification. The court granted the defendants' motions for summary judgment only because it determined that the plaintiff had failed to prove that the bearing did not comply with the specification. Specifically, the court determined that the plaintiff had failed to prove that the bearing had been changed at the last engine overhaul and, therefore, it found that the bearing potentially had been operating for 2664 hours, well over the 1870 hours specified. The court also held that "[t]he data stating that there will be a failure rate of 10 percent makes it impossible for the single failure of any one bearing to constitute nonconformity." *Maguire* v. *Hughes Aircraft Corp.*, supra, 725 F. Sup. 824. Therefore, the operational life of a product may be a specification for the purposes of the *Boyle* test.[26] Other

[26] In its brief, United Technologies attempts to distinguish *Maguire* by describing the life of the bearing as a "design criteria." We see no substantive difference between the 1870 hour operating life of the bearing at issue in *Maguire* and the 600 hour operating life of the fuel pump in the

authority reinforces this conclusion. See 3 American Law of Products Liability (T. Travers et al. eds., 3d Ed. 1987) § 45:1 et seq.

Finally, we note that although *Boyle* does not require the MOH to have been specifically included in equipment manuals in order to be considered a reasonably precise, government approved specification, there were several documents in which the MOH requirement was referenced or specifically stated. First, as we previously have mentioned, the 600 MOH was the focus of the government's component improvement program task number 557. The 600 MOH was also included in Pratt & Whitney's engineering change proposal 20638R1 recommending that the modulated bypass pump replace the IVSP, and it was the subject of Pratt & Whitney's internal memoranda regarding the "F100 MFP reliability and durability bench endurance." Also, the subject of Chandler-Evans' report to Pratt & Whitney on the MFP-330 analytical inspection was two "600 hour pumps" and the report concluded with a recommendation, "leave the MOH at 600 hours." In addition, after the modulated bypass configured MFP-330 was developed, the 1000 MOH was featured in the product's description.

In sum, the record reveals that the MOH was the most specific, quantitative requirement regarding the fuel pump that the government had actively required

case before us. United Technologies also attempts to argue that the *Maguire* court did not determine that the life of the bearing is a specification. The court stated that it was "not convinced that the life of the . . . bearing does not constitute a specification"; *Maguire* v. *Hughes Aircraft Corp.*, supra 725 F. Sup. 824; and then went on to find that the plaintiff failed to show that the bearing was nonconforming. Accordingly, the court determined that the second element of *Boyle* was satisfied. If the court had determined that the life of the bearing was not a specification, further analysis would have been unnecessary. Instead, in effect, the court determined that the bearing was in conformance with the specification. Therefore, we disagree with United Technologies' interpretation of *Maguire*.

and approved, and that it was the end result of all the testing and modifications that had been performed previously during the development of the pump. We conclude that this evidence created a genuine issue of material fact regarding whether the 600 MOH requirement is a specification.

## B

The second element of the *Boyle* test is that the equipment conformed to the government's specifications as approved. *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 512. Thus, if a defect has been caused by faulty manufacturing or some inadequacy on the part of the supplier with the result that the equipment does not comply with the government's specifications, the contractor fails this prong of *Boyle*. Id. This element is intended to protect only those contractors who have, in fact, complied with the specifications.[27]

The trial court determined that no reasonable jury could find that any of the defendants had failed to satisfy this element. The court concluded that the fuel pump's failure after only 230 hours of operation was not relevant to this element because it found that the MOH was not a specification. The trial court further concluded that the fuel pump was in compliance with all of the reasonably precise specifications that had been approved by the government and, therefore, that the three defendants had satisfied the second element of the *Boyle* test.

## 1

We agree that General Dynamics has satisfied the second prong of the *Boyle* test. The government con-

---

[27] A contractor's performance is nonconforming only "if the discrepancy between specifications and product [is] a material one . . . ." *In re Agent Orange Product Liability Litigation*, supra, 534 F. Sup. 1057. If the 600 MOH requirement is a specification, the subject pump, which failed after 230 hours of operation, was clearly nonconforming and further evaluation of substantial compliance is not required.

tracted with General Dynamics and United Technologies separately. General Dynamics was required under its contract to provide the air frame for the F-16 and incorporate all other government furnished aeronautical equipment into the frame. The F100-PW-200 engine, which included the MFP-330 fuel pump, was delivered by Pratt & Whitney to the government, and the government provided the engines to General Dynamics as government furnished aeronautical equipment for installation into the air frame. General Dynamics received no compensation for the engines and was not involved in their development or manufacture except as either pertained to compatibility with the air frame. In addition, General Dynamics was specifically required to install the F100-PW-200 engine in the Egyptian F-16B aircraft. There is no allegation of noncompliance by General Dynamics with any of the contractual specifications for which it was responsible. Therefore, we conclude that the trial court correctly determined that no jury reasonably could find that General Dynamics had failed to comply with the government's specifications.

### 2

According to our decision regarding the first element of the *Boyle* test, a determination must first be made at trial regarding whether the MOH was a specification. The parties do not dispute that the fuel pump at issue failed after 230 hours of operation. Consequently, if the MOH is determined to be a specification, the fuel pump failed to conform within the meaning of the second prong of *Boyle*. Because we have concluded that there is a genuine issue of material fact regarding whether the MOH is a *Boyle* specification, summary judgment in favor of the defendants Pratt & Whitney and Chandler-Evans was not proper.[28]

---

[28] Federal common law provides support for the proposition that this case should not be disposed of by summary judgment. It is well established that

3

The plaintiff also argues that, apart from the MOH, the fuel pump failed to conform to other government specifications and that, because the trial court failed to consider any of these alleged nonconformities, issues of fact remain as to whether these requirements were reasonably precise specifications with which the pump failed to conform.

The plaintiff specifically contends that the pump was defective in the following ways: (1) cavitation rates were excessive and therefore caused excessive damage to the IVSP configured MFP-330; and (2) the pump did not perform within the required usage and fuel parameters. In addition, the plaintiff claims that the IVSP failed to comply with the following purchase per-

whether a contractor is shielded from liability by the government contractor defense may be either a question of law or a question of fact. 3 L. Frumer & M. Friedman, Product Liability (1994) § 3.04[1]. This was clearly set forth in *Boyle*, which, applying federal law, stated that whether the facts establish the conditions for the government contract defense is a jury question. *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 500. Only if "no reasonable jury could find . . . on the basis of the evidence presented, that the Government contractor defense was inapplicable" is a defendant entitled to judgment as a matter of law. Id., 514. The question of whether the government approved reasonably precise specifications with which the contractor complied has been adjudicated as a question of fact, and cases in which the government contractor defense has been raised have treated its applicability as a jury question. See, e.g., *Bailey* v. *McDonnell Douglas Corp.*, 989 F.2d 794 (5th Cir. 1993) (denying summary judgment based on government contractor defense where manufacturing defect was alleged); *McGonigal* v. *Gearhart Industries, Inc.*, 851 F.2d 774 (5th Cir. 1988) (jury found contractor was not performing in compliance with government specifications regarding inspection procedures); *Jackson* v. *Deft, Inc.*, 223 Cal. App. 3d 1305, 273 Cal. Rptr. 214 (1990) (applying federal law, finding triable issue of fact concerning existence of substantial conflict between federal interest and state law under *Boyle*); *Dillaplain* v. *Lite Industries, Inc.*, 788 S.W.2d 530 (Mo. App. 1990) (under *Boyle* applicability of government contractor defense is question of fact for jury); *R.B. Hazard, Inc.* v. *Panco*, 240 Va. 438, 397 S.E.2d 866 (1990) (applying federal law, contradictory testimony on matters relating to *Boyle* criteria created question of fact for jury).

formance specifications: (1) specifications 3.2.2.11 and 3.2.8, which require that all metallic or parametallic parts have a minimum operational life of 4000 hours and be designed for a life of 6000 hours; (2) specifications 3.2.2.12 and 3.2.2.13, which require that the pump supply "the required amount of fuel at the required pressures for the operation of the engine throughout its complete operating range defined [in detail] by this specification" with or without assistance from the boost pump; (3) specification 3.2.3, which requires the pump to "operate continuously, efficiently and safely in accordance with its specified performance characteristics under the environmental standards specified"; (4) specification 3.2.3.2, which requires the pump to permit the engine to "air-start" within certain parameters after pump failure; (5) specifications 3.2.5.2, 3.2.5.5, 3.2.6.1 and 3.2.6.2, which require the pump to perform normally within a range of temperature, altitude, air flow and flight maneuver conditions; and (6) specification 3.3.1.6, which requires the pump to function "in world wide corrosive and erosive environments without elaborate protective procedures."

Although the trial court determined that the government had approved reasonably precise specifications for the MFP-330, it summarily concluded that the equipment had conformed to these specifications because the government had accepted the equipment as conforming to its requirements as evidenced by the signed form DD-250 and because the plaintiff had offered no evidence of a manufacturing defect. We conclude that the trial court improperly failed to analyze the alleged specifications according to the elements of *Boyle*.

The first element of *Boyle* required the trial court to determine whether the alleged requirements were among the reasonably precise specifications that the government had approved. The next element required

the trial court to determine whether the defendants complied with the specifications. See *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 512. "[T]he requirements of 'reasonably precise specifications' and conformity with them refer to the *particular feature* of the product claimed to be defective." (Emphasis in original.) *Bailey* v. *McDonnell Douglas Corp.*, 989 F.2d 794, 799 (5th Cir. 1993); see *Boyle* v. *United Technologies Corp.*, supra, 512; *Trevino* v. *General Dynamics Corp.*, supra, 865 F.2d 1486. Because the government contractor defense is an affirmative defense and the defendant must carry the burden of proving each element by a preponderance of the evidence, the court must evaluate each feature of the product claimed to be defective under each element of *Boyle* in order to determine whether the defendant has met its burden. See, e.g., *Tillett* v. *J.I. Case Co.*, 756 F.2d 591 (7th Cir. 1985). In addition, we note that, in order to be entitled to summary judgment, the defendants bear the heavy burden of proving that there is no genuine issue of material fact, and the trial court must view the evidence in the light most favorable to the nonmoving party. *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 105, 639 A.2d 507 (1994). In this case, the trial court improperly failed to engage in the proper analysis.

First, we do not consider the United States government's signing of a DD-250 form to be, in and of itself, conclusive proof that the fuel pump at issue in this case complied with the government's specifications. Although we acknowledge that initial acceptance by the United States government, in the form of a signed DD-250, is some evidence that the aircraft complied with specifications, such preliminary acceptance cannot foreclose the possibility that the aircraft, in fact, was nonconforming. Especially in a highly complex product such as a military aircraft, slight deviations from required specifications may pass an initial inspection

unnoticed, only to become apparent later after further examination or, as alleged by the plaintiff in this case, after such deviations have resulted in the malfunction of the product.

The government inspection and approval process that culminated in the signing of the DD-250 in this case appears to be the standard procedure for all military aircraft that the government purchases. See, e.g., *Lewis* v. *Babcock Industries, Inc.,* supra, 985 F.2d 83 (describing development of F-111-F jet fighter); *Kleemann* v. *McDonnell Douglas Corp.,* supra, 890 F.2d 698 (describing development of F/A-18 aircraft); *In re Aircraft Crash Litigation, Frederick, Maryland,* supra, 752 F. Sup. 1326 (describing development of EC-135N jet aircraft). If we were to conclude that the signing of a DD-250 constitutes government approval of any inherent defect as a matter of law, the signing of a DD-250 would foreclose any cause of action against a government contractor for latent defects regardless of whether the government was actually aware of the defects. This interpretation is contrary to the criteria set forth in *Boyle* requiring that, in order for the defense to apply, the government must have specific knowledge of the defect and must nonetheless have given either its explicit and implicit approval of the product. See *Boyle* v. *United Technologies Corp.,* supra, 487 U.S. 512–13. In this case, the government's awareness that the MFP-330 was subject to cavitation damage does not lead to the conclusion that because it signed a DD-250, it implicitly accepted that the MFP-330 would have an operational life of less than 600 hours. Therefore, the trial court's finding that the signed DD-250 constituted proof that the equipment complied with all specifications was insufficient to establish conclusively that the defendants had complied with the government's specifications.

Finally, a summary determination that the plaintiff had failed to prove a manufacturing defect was an inappropriate basis for summary judgment on this issue. First, the defendants must satisfy the three elements of *Boyle* before the burden shifts to the plaintiff to present evidence of a manufacturing defect. *Bailey* v. *McDonnell Douglas Corp.*, supra, 989 F.2d 802. "To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1321. Thus, the trial court must first analyze, according to the elements of *Boyle*, the plaintiff's various claims that the fuel pump did not conform to specifications. Only if the trial court determines that the defendant has satisfied the three elements of *Boyle* for each of the alleged specifications must the court consider the plaintiff's proof of a manufacturing defect. Id. In *Bailey*, the court determined that "[b]ecause [the defendant] did not present evidence that the three *Boyle* conditions were satisfied with respect to the [specification at issue], upon which Bailey's manufacturing defect claim was based, it did not meet its burden of proof with respect to that claim; and, therefore, the burden did not shift to Bailey to present evidence to support her claim." *Bailey* v. *McDonnell Douglas Corp.*, supra, 802. As we have previously stated, in this case, the trial court failed to engage properly in the initial *Boyle* analysis. For these reasons, we conclude that the trial court improperly rendered summary judgment for Pratt & Whitney and Chandler-Evans.

C

We next consider whether the trial court properly determined that there was no genuine issue of whether the defendants had proven the third prong of *Boyle*. To satisfy the third element of the *Boyle* test, the contractor must have warned the government "about the dangers in the use of the equipment that were known

to the supplier but not to the [government]." *Boyle* v. *United Technologies Corp.*, supra, 487 U.S. 512. "The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." Id. The trial court determined that the government had full knowledge of the cavitation problem that was inherent in the fuel pumps and that there was no evidence that the contractors withheld any information regarding potential dangers known to them. The trial court concluded, accordingly, that no jury reasonably could find that the defendants had failed to satisfy the third prong of *Boyle*. We agree.

The duty to warn requires disclosure only when the supplier's knowledge of the danger or defect is superior to that of the government. *Lewis* v. *Babcock Industries, Inc.*, supra, 985 F.2d 89–90; *Stout* v. *Borg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir.), reh. denied en banc, 940 F.2d 657, cert. denied, 502 U.S. 981, 112 S. Ct. 584, 116 L. Ed. 2d 609 (1991). The third element is met when there is evidence in the record that the government knew about the problem and there is no evidence that the contractor withheld any additional information about the problem. *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1321.

Our discussion of the first two *Boyle* elements illustrates the extent of the government's involvement in the process of developing the MFP-330 fuel pump and the F100 series engine. This shows that the government had full knowledge of all problems known to Chandler-Evans and Pratt & Whitney. Further, our review of the record indicates General Dynamics' total lack of involvement in that process, which establishes that it had no knowledge of problems with the MFP-330

sufficient to give rise to a duty to warn. Indeed, no reasonable fact finder could dispute these conclusions.

The development of the MFP-330 was obviously a joint effort of the United States government, Chandler-Evans and Pratt & Whitney. Government approval was required at every phase of the development process, and once the specifications were determined, any deviation required government approval. In addition, the government maintained a presence at the manufacturing facilities and assigned an engineer to work on the fuel pump. The government approved the procedure to test the pump, and each additional test was reviewed and approved by the government prior to the continued production of the pump. According to the testimony of government personnel who were involved in the project, the government was fully aware of the cavitation erosion problems inherent in the pump. This awareness is also evident from the initiation of the component improvement program as a remedial measure; see *Lewis* v. *Babcock Industries, Inc.*, supra, 985 F.2d 89–90; *Stout* v. *Borg-Warner Corp.*, supra, 933 F.2d 336; *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1321–22; and the conservative determination of the MOH. Furthermore, the government was fully aware of the Israeli incident involving an IVSP fuel pump that failed to start on the runway. A subsequent investigation that was ordered by the government revealed that the failure was due to excessive cavitation erosion, which tends to show the government had knowledge of the problem. See *Harduvel* v. *General Dynamics Corp.*, supra, 1321–22. Thus, we concur with the trial court's determination that the plaintiff presented no evidence that Pratt & Whitney or Chandler-Evans had withheld any relevant information.

Moreover, we note that there was no evidence to show that General Dynamics had any knowledge about cavitation erosion problems with the fuel pump.

Because General Dynamics had no such knowledge, they had no duty to the government regarding any alleged defect in the fuel pump. See *Nicholson* v. *United Technologies Corp.*, 697 F. Sup. 598, 605 (D. Conn. 1988). We therefore agree that the defendants complied with the third prong of the *Boyle* test.

## III

We next address the plaintiff's claim that the government contractor defense does not shield the defendants from liability because they failed to warn the Egyptian government about the dangers inherent in the MFP-330 fuel pump. The trial court treated this claim as part of the third element of the *Boyle* test and determined that the defendants had no duty to notify anyone other that the United States government of known dangers or defects. Although we disagree with the trial court's analysis, we agree that the defendants are entitled to immunity from the plaintiff's failure to warn claims under the government contractor defense.

In *Boyle*, the United States Supreme Court applied the government contractor defense only to design defects. Subsequent cases in the lower federal courts, however, have extended the application of the defense to failure to warn claims. See, e.g., *In re Joint Eastern & Southern District New York Asbestos Litigation*, 897 F.2d 626 (2d Cir. 1990); *Niemann* v. *McDonnell Douglas Corp.*, 721 F. Sup. 1019 (S.D. Ill. 1989); *Nicholson* v. *United Technologies Corp.*, supra, 697 F. Sup. 598. Although the government contractor defense may function as an affirmative defense to a failure to warn claim; *Nicholson* v. *United Technologies Corp.*, supra, 604; a failure to warn claim is *not automatically* precluded by the government contractor defense. See *In re Joint Eastern & Southern District New York Asbestos Litigation*, supra, 632. Thus, the government contractor defense may not shield a contractor from

liability on a failure to warn claim even if the defense does shield that contractor from the plaintiff's defective design claims. *In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 839–40 (2d Cir. 1992). " '[I]t is not unreasonable to imagine that . . . government contracts often may focus upon product content and design while leaving other safety-related decisions, such as the method of product manufacture or the nature of product warnings, to the contractor's sole discretion. In these instances, state law design requirements are displaced, although state law warning requirements are not.' " Id., 840, quoting *In re Joint Eastern & Southern District New York Asbestos Litigation*, supra, 631.

Therefore, the resolution of a failure to warn claim requires a separate *Boyle*-type analysis. First, the government contractor defense applies only if the government dictated with reasonable precision the content of the initial warnings included in the operational or maintenance manuals and limited or precluded the contractor from advising the user of additional information or revisions. See *In re Agent Orange Product Liability Litigation*, 996 F.2d 1425, 1436 (2d Cir. 1993), cert. denied sub nom. *Ivy* v. *Diamond Shamrock Chemicals Co.*,      U.S.     , 114 S. Ct. 1125, 127 L. Ed. 2d 434 (1994); *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 812 (9th Cir. 1992); *In re Joint Eastern & Southern District New York Asbestos Litigation*, supra, 897 F.2d 630; *Nicholson* v. *United Technologies Corp.*, supra, 697 F. Sup. 604. Second, the contractor must have acted in conformity with those reasonably precise specifications established or approved by the government concerning the contents of the maintenance manual. *Nicholson* v. *United Technologies Corp.*, supra, 604. Third, "the supplier [must] have warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." Id., 605.

In this case, both the operational flight manuals and the maintenance manuals were provided for the F-16. The government specified the contents of the manuals and, therefore, controlled the content of any warnings. General Dynamics prepared the manuals according to those specifications, and the government reviewed them to ascertain compliance. Only then were they given government approval and published. Thereafter, the government had to approve any subsequent revisions to the manuals. The United States government, therefore, directly controlled the content of the operational flight and maintenance manuals.

Furthermore, the Air Force had established a "technical assistance field team," which served as a conduit for all official communications to the Egyptian government regarding engine problems. Although United Technologies and General Dynamics maintained support staff in Egypt, the United States government restricted direct communication between the contractors and the Egyptian government regarding technical data. For example, all information regarding the Israeli incident was directed through the United States government's F-16 technical assistance field team that was stationed in Israel. The Pratt & Whitney employees in Egypt were not informed of the incident until after the Egyptian F-16B had crashed. In addition, the terms and conditions of the contract between Egypt and the United States government restricted direct communication between Egypt and the contractors.[29]

---

[29] The contract, dated June, 1980, between the Air Force and Egypt provides: "Export of Data: The Contractor or subcontractor shall not be required to deliver to the [Government of Egypt] nor to any person or entity not a citizen of the [United States], any technical data produced or utilized under the Program until furnished with evidence acceptable to it that such delivery of the data is (1) approved by the Office of Munitions Control of the [United States] State Department pursuant to the International Traffic in Arms Regulations of that Agency, or (2) approval is not required."

Finally, the Arms Export Control Act strictly limits the circumstances in which a contractor can furnish any technical data to foreign countries. 22 U.S.C. § 2751 et seq. Therefore, we conclude, as a matter of law, that the government dictated reasonably precise specifications for the contents of the operational flight and maintenance manuals and any subsequent amendments to them. We also conclude, as a matter of law, that the United States government controlled or limited the information that could be communicated directly by the contractors to the Egyptian government.

As to the second element, there is no evidence that any of the defendants failed to comply with the government's specifications for the content of these manuals. Indeed, every indication shows that the defendants fully complied with the government's specifications. Finally, because the third element of this application of the government contractor defense is identical to that of the defense in the design defect context, we need not repeat that discussion. Instead, we need only emphasize that we have already determined that the United States government was aware of all the dangers associated with the use of the IVSP vane pump. Therefore, the government contractor defense precludes the plaintiff's failure to warn claims, and the trial court properly rendered summary judgment in favor of the defendants on that issue.

## IV

In conclusion, we affirm the trial court's decision to grant General Dynamics' motion for summary judgment on all counts against it. We also agree with the trial court's determination that the government contractor defense is not precluded merely because of the intended transfer of the aircraft to a foreign government. We further agree with the trial court's determination that the plaintiff's failure to warn claims are

precluded by the government contractor defense as a matter of law. We conclude, however, that the trial court improperly granted United Technologies' and Chandler-Evans' motions for summary judgment on the plaintiff's design defect and manufacturing defect claims because there remain genuine issues of material fact regarding whether those two defendants complied with the reasonably precise specifications approved by the government.

The judgment is reversed in part and the case is remanded for further proceedings in accordance with this opinion and otherwise according to law.

In this opinion BERDON and NORCOTT, Js., concurred.

BORDEN, J., with whom PALMER, J., joins, concurring and dissenting. I agree with and join parts I, II A 1, II B 1, II C and III of the majority opinion. Thus, I agree with the majority that: (1) the government contractor defense protects government contractors who sell equipment to the United States government that is ultimately destined for sale to a foreign country; (2) "the trial court correctly determined that there was no genuine issue of material fact over whether the government had approved reasonably precise specifications for each of the defendants' products," within the meaning of *Boyle* v. *United Technologies Corp.*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988); (3) General Dynamics Corporation (General Dynamics) has satisfied the government contractor defense as a matter of law; (4) the trial court correctly determined that no reasonable jury could find that the defendants had failed to warn the government of danger in the use of the equipment, known to them but not the government, thereby satisfying the third *Boyle* prong; and (5) the government contractor defense precludes the plaintiff's failure to warn claims as against all of the defendants.

I disagree, however, with parts II A 2, II B 2 and II B 3 of the majority opinion. Thus, I disagree with the majority that, with respect to the defendants United Technologies Corporation (United Technologies) and Chandler-Evans, Inc. (Chandler-Evans), a reasonable fact finder could find that: (1) the maximum operating hours (MOH) was a reasonably precise specification, within the meaning of *Boyle*; and (2) apart from the MOH, the fuel pump failed to conform to other reasonably precise specifications. I would hold that, based on this record, the trial court properly rendered summary judgment in favor of all of the defendants, and would affirm the trial court's judgment. I therefore dissent.[1]

## THE MOH

The gist of the majority's argument with respect to the MOH is that "in addition to being the maximum operating hours a pump was to be run before being pulled for inspection and maintenance, a reasonable fact finder could conclude that the MOH also signified the *minimum* number of safe operating hours before which the fuel pump would not need to be overhauled *in order to ensure against engine failure.*"[2] (Emphasis added.) What this does not explicitly say, but what it implicitly acknowledges, is that if "maximum" does mean "maximum," the MOH cannot be a "reasonably precise specification" within the meaning of *Boyle*

---

[1] I apologize for the length of this response to the majority opinion. To paraphrase Blaise Pascal (1623–1662), if I had had more time I would have written a shorter dissent. See Bartlett's Familiar Quotations (15th Ed. 1980) p. 299 ("I have made this letter longer than usual, because I lack the time to make it short." Blaise Pascal, Lettres Provinciales [1656–1657] n.16.); see also id., p. 299 n.3 ("Not that a story need be long, but it will take a long while to make it short." Henry David Thoreau, Letter to Mr. B [November 16, 1857]).

[2] This is preceded by subsidiary conclusions that "the character of the 'maximum operating hours' requirement is unclear" and that "the MOH can be interpreted as more than a mere maintenance guideline or qualitative safety goal."

because it would only be susceptible to being interpreted as a directive to the user not to permit the pump to go *beyond* 600 hours of operation before inspection or overhaul. Such a directive, however, would not say anything about what is *guaranteed before* that maximum time has been reached. Thus, under that meaning the MOH could not be a "specification," and could only be a "maintenance guideline" or some other non-specification standard, such as a "precatory goal," "performance specification," or "qualitative safety goal" because, by definition, it would not be something to which the *contractor* could fail to conform.

What the majority opinion—reading "maximum" to mean "minimum," in order "to ensure against engine failure"—does say, however, is that this record permits the inference that the government, United Technologies and Chandler-Evans intended[3] the MOH to be a warranty of safe operation for a specified period of time. Thus, according to the majority opinion the MOH means the following: if any particular fuel pump fails before 600 hours of operation, *for any reason* (not solely due to cavitation, because as the entire record makes clear, the MOH was set, not just to account for the risks

---

[3] It is clear to me—and, although the opinion does not say so explicitly, I do not read it to say the contrary—that the question of whether a particular standard is a *Boyle* "reasonably precise specification" is ultimately a question of how the parties to the transaction themselves regarded it. That is the only rational conclusion, because the only source for deciding that question is the documentary record established by the parties, and the deposition testimony of the various governmental and contractor employees involved in the process. Something is not a "specification" in the ether; the determination as to whether something is a "specification" occurs within the context of the entire design and manufacturing process described in the opinion. This principle is supported by *Landgraf* v. *McDonnell Douglas Helicopter Co.*, 993 F.2d 558 (6th Cir.), cert. denied, 510 U.S. 993, 114 S. Ct. 553, 126 L. Ed. 2d 454 (1993), discussed at length in the text of this dissent.

incurred due to cavitation, but in light of all other risks as well), the contractors have failed to provide a product that "conformed" to a "reasonably precise specification" within the meaning of *Boyle*.

In my view, this inference is unsupported by and contrary to the record, and is unsupported by and contrary to the applicable case law. Whether one calls the MOH a "maintenance guideline," as did the trial court, or a "precatory goal," "qualitative safety goal," "performance specification," or any one of a number of other terms that the federal courts have used to distinguish a particular standard from a *Boyle* specification, the only permissible inference from this record, read in light of the applicable case law, is that the MOH is not a "reasonably precise specification" within the meaning of *Boyle*.

First, to transform "maximum" into its antonym, namely, "minimum," and thus to render the MOH a time warranty of performance, has to strike one as an odd way, to say the least, for the contracting parties to go about creating such a warranty. This is particularly true in this case, because nowhere in the voluminous documentation supplied by the parties is there any document labeled the "MOH." A time warranty of performance for such a unique and vital part of the F-16 engine, namely, not just a fuel pump but "a fuel controller [that is] intimately involved with the operation of the engine [and is] a lot more complex than the basic pump," would certainly constitute an important contractual provision—both to the government and the contractors. It is not only counterintuitive but counter to this record to believe that the parties would, in order to create such an important provision: (1) never define the warranty in any document; (2) never use language that even suggests such a warranty; and

(3) instead, use language that, in its ordinary usage, means exactly the opposite of what they intended.[4]

Although it is perhaps a widespread belief that the United States government sometimes moves in strange and wonderful (in the sense of instilling wonder, not in the sense of "terrific") ways, there is no justification in this record for inferring such a startling and unusual course of conduct, particularly in light of the

---

[4] Although the majority points to several documents in the record that mention the MOH of 600 hours, none of those documents defines the term or suggests that the MOH was considered to be a time warranty of performance. Moreover, those documents suggest that the MOH was a maximum—a limit or a goal. Component improvement program task number 557 indicates that "the present pump configuration is limited in MOH and requires maintenance actions in terms of a spin up test to achieve this *limit.*" (Emphasis added.) Pratt & Whitney's engineering change proposal 20638R1 indicated that "[v]ane stage cavitation erosion and vane tilt wear are the main durability problems in the Main Fuel Pump which limit the MOH to 600 hours in the F100-PW-200 (F-16)," and recommended changes to the pump and future testing "with the intent of increasing the MOH toward 1000 hours." Similarly, the Pratt & Whitney internal memorandum cited by the majority indicates that the "current MOH for the F100 MFP is limited to 600 hours primarily because of the effects of vane tilt wear and cavitation erosion." Chandler-Evan's report to Pratt & Whitney speaks of obtaining additional data with which they would "be able to make a decision on whether or not to extend the MOH."

Finally, the majority indicates that after the modulated bypass configured MFP-330 was developed, the product description included the MOH of 1000 hours. Although I am not sure what this has to do with whether the MOH is a specification, and I can discern no reason why this would indicate that the MOH was a minimum of guaranteed performance, what the majority refers to as a product description is simply a rough diagram of the pump with a service evaluation for the F-15 and the F-16. The relevant evaluation provides the following:
   "F-16 service evaluation
   -10 MFP's have accumulated 5800 hours
   -3 high time MFP's (600 hours) inspected and in excellent condition
   -Cleared for 1000 hours MOH with next inspection at 800"
If the 1000 hours MOH is now a specification, namely, a time warranty of performance for 1000 hours *minimum,* I fail to understand why an inspection was required at 800 hours. If anything, this document supports my point that the MOH was a maximum, and, moreover, a goal for performance, not a warranty.

fact that the MOH was arrived at by consensus of the contracting parties. Thus, under the majority's reading of this record, one has to indulge in the illusion that, not only did the government intend to mean the opposite when it used the term "maximum," but that the contractors also understood that to be the case, and acquiesced in that usage despite the absence of a single piece of paper that said so. Although such a scenario could be envisioned, before we permit the drawing of such a bizarre inference from a printed record we ought to require a showing that justifies it. That showing is lacking here.

The evidence in the record that the majority offers to justify its conclusion that "maximum" means "minimum"[5] consists of certain deposition testimony of Kenneth E. Binns, an engineer assigned by the government to the development of the F-15 fuel pump,

---

[5] The discussion in the majority opinion regarding the fact that the MOH was set conservatively and for safety reasons is essentially irrelevant. Of course it was set with safety in mind. But to say that is to imply that the MOH only had to do with safety and not with performance as well. If the entire discussion of the development of the F-16 engine, including its unique fuel pump, makes anything clear it is that that development was an exercise in balancing safety against performance, at practically every stage, and in an environment in which the desired performance could never be obtained with the certainty of complete safety. The discussion in *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1322 (11th Cir. 1989), cert. denied, 494 U.S. 1030, 110 S. Ct. 1479, 108 L. Ed. 2d 615 (1990), involving the F-16, makes that clear: "The pilots and crews of military aircraft willingly embrace the risks that they assume by volunteering to serve our country. They are not the military doubles of civilian motorists . . . or ordinary purchasers of consumer products. *The Supreme Court's adoption of the government contractor defense recognizes that one of these risks is the operation of equipment in which safety concerns have been balanced against cost and performance.* With respect to consumer goods, state tort law may hold manufacturers liable where such a balance is found unreasonable. In the sensitive area of federal military procurement, however, the balance is not one for state tort law to strike. Although the defense may sometimes seem harsh in its operation, it is a necessary consequence of the incompatibility of modern products liability law and the exigencies of national defense." (Citation omitted; emphasis added; internal quotation marks omitted.)

and certain deposition testimony of Paul Baxter, the systems program office engineer in charge of the durability aspects of the F100 engine.

Baxter's deposition testimony was as follows: "Q. Have you heard the acronym, or whatever it may be, called MOH? A. Yes. Q. And what does MOH refer to? A. Maximum operating hours. It is a term that we use to define the maximum time that we would like to see accumulated on a piece of equipment before it undergoes some overhaul or inspection. Q. At the time you became involved with the engine controls for the F100 engine, what was the MOH then set for the [Chandler-Evans, Inc.] MFP main fuel pump? A. I don't recall. Q. Do you recall if the government had a goal or expectation concerning the fuel pump MOH? A. We wanted it to be greater than what it was at that time." "Q. At the time you were actively setting the MOH for the fuel pump being in the F-15 application, do you recall what the MOH value was . . . ? A. No sir, I don't. I know that we had a goal for life, but I don't remember specifically what that number was. Q. Do you recall what the goal for life was? A. No, I do not. I can give you a guess. Guess is probably 1000, 1200 hours, somewhere along through there. Q. And that would be an MOH goal? A. Yes. Q. And what would that mean in relation to a pump components' service life, overall service life? A. Rephrase your question. Q. If a fuel pump MOH were 1000 hours, what relation would 1000 hours of service on that pump have to what the Government expected the pump's total hours of service life to be before complete replacement? A. By 1000 MOH we meant it was our desire that the pump be installed on an engine and operate for 1000 total operating hours before it had to be removed and sent for overhaul. Okay."

This testimony, rather than supporting an inference that "maximum" means "minimum" and that the MOH was a time warranty of performance, demonstrates the contrary. According to Baxter's testimony, the MOH was "the *maximum* time" the government "*would like to see* accumulated" on the fuel pump before it underwent "some overhaul or inspection." (Emphasis added.) It was viewed as a "*goal or expectation*," as a "*goal for life*," and it expressed the government's "*desire*" that the pump operate for the stated number of hours before it was removed for overhaul. (Emphasis added.) This testimony brings the MOH clearly within any of the categories that the courts have recognized as a matter of law are not "specifications" within *Boyle*. Furthermore, this general view of the MOH is consistent with all of the documentation and testimony presented in the record regarding the MOH, and none of that material supports the view that "maximum" means "minimum" and that the MOH was, therefore, a time warranty of performance.

Binns' deposition testimony, while arguably closer to the reading ascribed to it by the majority, nonetheless does not support that reading when considered in its proper context. That testimony was as follows: "Q. And is it fair to say that the MOH value arrived at by a consensus and directed from time to time by the Government was a conservative value? A. Yes. . . . Q. And the MOH value was arrived at by the evaluation of testing and field service data and inspection of main fuel pumps? . . . A. Yes. . . . Q. Do you recall participating in discussions which led to setting the MOH for the main fuel pump at 600 hours? A. I do for the F-15. I'm not sure, I don't remember the F-16. Q. The MOH value number of hours was set, was it not, such that when the fuel pump would reach that number of hours it would not have failed? A. Correct. Q. And the MOH value was at the time at a particular number of hours

purposefully to require an inspection or overhaul or some type of maintenance item before a pump was believed to be in danger of failing, is that correct? A. Right. Q. Consequently, there was no concern of flight safety if a main fuel pump were operating within its approved MOH, is that correct? A. Correct. Q. And the efforts that were being pursued in the component improvement program with respect to the reliability and durability of the main fuel pump were not involved with safety of flight problems or concerns before the Egyptian incident in January of 1983? A. Right. Q. And the setting, establishing of an MOH in and of itself was not in an effort to avoid and protect from safety of flight issues involving the main fuel pump? A. Yes."

I can find nothing in this testimony that reasonably supports the inference that "maximum" means "minimum," and that, therefore, the MOH was a time warranty of safe performance. The facts that, as Binns testified, the MOH was set such that the pump would not have failed before that number of hours, to require an inspection or overhaul "before" it was in danger of failing, and that there was no concern for flight safety if the pump were operating within its MOH, do not support such an anomalous inference. Instead, those facts are fully consistent with the normal meaning of MOH, as articulated by Baxter above, and as shown by the rest of the record, and can only be reasonably understood as such. *Of course* the *maximum* number of hours of operation before being brought in for inspection and overhaul would be set at a point *before* the parties felt it was in danger of failing. Who would rationally expect otherwise, namely, that the government and contractors would, by consensus, arrive at a number of hours *beyond which* the pump should not be operated without inspection, and in doing so use a number of hours that the parties felt was *unsafe* for continued operation?

To put it another way, it is reasonable to assume that, in setting such a figure, the government and its contractors would always arrive at a figure that they considered to be safe, and it is unreasonable to assume that they would ever arrive at a figure that they considered to be unsafe. This is all that Binns' deposition testimony can reasonably be read to suggest. Thus, to say, as the majority does, that the MOH could be construed as a specification, as opposed to a maintenance guideline, *because* the parties set it at a point that they considered to be safe, would mean that a maintenance guideline (in the sense used here—the maximum number of hours beyond which the pump should not be operated without inspection) would always be, by definition, a *Boyle* "specification," because such a guideline would always be set at a value considered safe by the government and the contractors. Binns' testimony simply cannot carry the weight of such a chain of inferences.

As I indicate above, the rest of the record indicates that the MOH was considered by the parties to be consistent with Baxter's testimony, and inconsistent with the notion of the MOH as a "minimum" and a time warranty of performance. The only reasonable view of this record is that the MOH was, in effect, a benchmark for inspection, established in order to obtain information as to the operation of the fuel pump, which had been set at a level of perceived safety.[6] The record is

---

[6] For example, Marvin E. Bryant, who had been the Air Force program manager for the F100 engine, which powered both the F-15 and F-16, testified by deposition that the term MOH means "maximum operating hours." When asked to describe the nature of his duties with respect to the MOH for the MFP-330, he testified: "My job was to consider the recommendations from the contractors and from the in-house Air Force engineers and logistics regarding the number of hours *they thought that it would be safe to operate before it would need to be reviewed for overhaul.*" (Emphasis added.) He testified further that there was a margin of safety built into the MOH, stating that because the F-16 was a single engine airplane, as compared to the twin engine F-15, "the numbers of hours that we would allow the components to operate on the F-16 were actually less than on the F-15. That

uncontradicted that the MOH was set following inspec-
tions of the pump after the design and manufacture
of those pumps had been accepted as conforming to
specifications, and had been placed in operational air-
craft.[7] There is nothing in this record to support the
notion that "maximum" means "minimum," or that
the MOH was perceived as a warranty of safe opera-
tion for the period of time set by the MOH.[8] There sim-

allowed you to get information *on how the component [was] likely to oper-*
*ate,* for extending periods of time, but it also adds to the safety of the com-
ponent for the F-16." (Emphasis added.)

[7] Binns testified regarding "the decision in arriving at the MOH value
for the pump" as follows: "[I]n order to establish MOH, we had to tear
down the units from the field at certain hours. In other words, we had any-
where from three to five pumps to come in at 300 hours to look at them,
determine the condition of the pump, and determine if we could extend
the MOH. We would put that particular hardware on the bench to run for
an additional length, the next 300 hours or hundred hours, look at it again,
and that's how we extended it." This was done jointly by United Technol-
ogies, Chandler-Evans and the Air Force. Binns also made clear that the
purpose of this process of establishing the MOH was to determine how the
pump design was faring in actual service operation and use with respect
to "[a]ll aspects not just cavitation."

The testimony of George W. Jahrstorfer, a Chandler-Evans engineer,
regarding the setting of an MOH is consistent with that of Binns. Jahr-
storfer testified: "It's usually done by taking some product after a certain
number of hours, and doing an inspection, teardown inspection after some
period of time. It might have been 200 hours or less, and that data is
reviewed by people from our place, from our customer, Pratt & Whitney,
and from the [United States] Government, and looking at more than one
in some cases, number of units to determine that, yes, we can continue
to use this because everything in it is the way we expected it."

[8] James Crouch, a project engineer for the F100 engine, testified that, with
regard to "setting the MOH for the main fuel pump for the F100 engine during
the 1981 through 1983 time frame," although "us engineers made the recom-
mendation . . . [u]ltimately it was Mr. Bryant's agreement to send out a mes-
sage to the field saying that *the limit* had been extended that decided if it had
been approved or disapproved." (Emphasis added.) When asked whether "the
Air Force itself, as distinguished from Pratt & Whitney or [Chandler-Evans],
ha[d] *a goal* with respect to the main fuel pump MOH after the 1981–83 time
frame," Crouch testified: "I believe that there was the CIP task on the mod
by-pass. In this definite task I believe there was *maybe a goal stated* in that,
and *there usually is a goal, but I don't recall exactly what goal for that MOH
was,* if it was 1000 or 1500 hours or what." (Emphasis added.) This tes-

ply is no basis for an inference that either the government, United Technologies or Chandler-Evans ever considered it as such. The MOH can be reasonably viewed only as an outer limit or goal of expected safe operation beyond which the unit should not operate without inspection, and not as an inner limit, as the notion of "minimum" hours to overhaul would suggest. Indeed, the fact that the MOH could change over time, depending on what the various inspections might disclose, militates strongly against considering it as such a warranty.[9]

Second, the conclusion of the majority that the MOH can be construed as a specification is contrary to the applicable case law. In my view, the closest case to this case is *Landgraf* v. *McDonnell Douglas Helicopter Co.*, 993 F.2d 558 (6th Cir.), cert. denied, 510 U.S. 993, 114 S. Ct. 553, 126 L. Ed. 2d 454 (1993). In that case, the widow of a United States Army chief warrant officer killed in a 1988 helicopter crash brought a wrongful death action against the manufacturer of the helicopter. The United States District Court had rendered summary judgment for the contractor on the basis of the government contractor defense. The question on appeal was whether "a pre-existing Military Specification (MIL-S), which

---

timony presents the MOH in terms of limits and goals, not specific time warranties of performance. Nowhere, moreover, does it suggest that "maximum" means "minimum."

[9] In this connection, the majority asserts that, although the subsequent 1000 MOH was a goal, the 600 MOH was a specification. One can assert this, but I have found no authority for such a proposition, namely, that of two examples of the exact same standard (although with different numerical values) for the exact same aircraft, both of which serve the exact same functions, one can be a goal and the other a specification. Nor can I understand the logic of such an assertion, particularly when one recognizes that it is essentially the intent of the government that determines whether a standard is a *Boyle* specification. Moreover, I cannot reconcile the assertion that 600 MOH was a specification and 1000 MOH was a goal with Pratt & Whitney's stated "intent of increasing the MOH *toward* 1000 hours." (Emphasis added.)

was incorporated by reference in the Detail Specification for the helicopter involved in the fatal crash, constituted a 'reasonably precise specification' that the manufacturer was required to meet." Id. The helicopter had been manufactured by the defendant in 1969.

The decedent was aboard the helicopter as a technical observer on a training flight. When the helicopter lost power and began to descend, "[t]he speed of the main rotor dropped sharply and one of the main rotor blades struck the tail boom and severed it," causing the helicopter to crash violently. Id., 559. It was undisputed "that the fatal crash was caused by the striking and severing of a portion of the tail boom." Id., 563. Moreover, the defendant conceded that the "Detail Specification for [the helicopter] incorporated MIL-S-8698 by reference." MIL-S-8698 was titled "Structural Design Requirements, Helicopters, dated 1 July 1954," and the applicable paragraph, captioned "Rotor blade clearance," provided that "[t]he design of the rotor system(s) shall be such that, upon installation on the helicopter, there shall be sufficient clearance of the blades to the ground, to each other, and to other parts of the helicopter . . . . During operation in all flight regimes, the clearance between main rotor blades and other parts of the helicopter shall not be less than 9 inches, and preferably 12 inches . . . . The design of the rotors shall be such as to preclude the possibility of the blades striking each other or any part of the helicopter . . . ." Id., 560–61. Moreover, the contract documents provided a method by which the defendant could have sought a deviation from the Detail Specification and, indeed, there were forty-three pages of such deviations, but none involving this provision. Id., 563.

The plaintiff argued that, based on the documentary evidence, and on the admissions of the defendant and its experts that the provision had been incorporated

into the "Detail Specification[s]," which the plaintiff contended were " 'reasonably precise' " and with respect to which the defendant had not sought a deviation, the defendant had failed to comply with those specifications. Thus, the plaintiff argued, there was a sufficient basis to resist a summary judgment on the second prong of the government contractor defense. Id., 563.

The defendant argued that, "while MIL-S-8698 . . . contains some specific details (9 to 12 inch clearance), taken as a whole it is only a precatory statement of the Army's goal of obtaining helicopters that are safe from rotor blade/tail boom contact in normal flying conditions," and that when a helicopter goes into descent without power there is always a possibility of the rotor blades striking other parts of the aircraft. Id., 561. Further, the defendant relied on its years of contact with the Army in the procurement, testing and production of the particular type of helicopter. Id., 562.

The court acknowledged the specificity of this provision, and acknowledged further that if the case "were controlled by strict contract principles," those principles would be binding on the defendant because "[t]he language incorporating MIL-S-8698 appears to be clear and unqualified," and "it would be hard to sustain the defendant's position." Id., 562. The court concluded, nonetheless, that as a matter of law under the government contractor defense this provision was "a precatory statement only" and was not, therefore, a reasonably precise specification within the meaning of *Boyle*. Id., 564.

The court's reasoning was as follows. The record disclosed that, in 1967, the Army had been informed by Hughes Tool Company (Hughes), the defendant's predecessor that had manufactured the helicopter, that flight tests indicated that "a rotor blade could strike

the tail boom of a helicopter during unusual conditions." Id., 563. The Army, nonetheless, in 1969 had only authorized additional tests by Hughes to investigate rotor tail/boom clearance, "the final result of [which] will be the determination of possible changes to the [helicopter] configuration leading to a reduction in the probability of tail boom strikes." Id.

The court in *Landgraf* stated further: "Although Hughes reported to the Army that there was a clearance of as little as three inches in one or more of the simulated autorotational landings—not the 9 to 12 inches mentioned in MIL-S-8698—the Army ordered no further changes in the configuration. This is strong evidence that the Army considered the contents of MIL-S-8698 as stating a desirable goal and a recommended way of achieving it, but not precise specifications. We do not believe the Army treated the MIL-S-8698 as formulating mandatory requirements. By permitting production to continue without any change in design following the 1969 tests, the Army made a discretionary decision to not insist on the clearance recommended in MIL-S-8698. Regardless of the original purpose of incorporating that specification into the governing documents for the [helicopter], by acquiescing in the continued production without change and acceptance and certification of helicopters produced thereafter, the Army treated MIL-S-8698 as a precatory statement." Id., 564. Further, the court noted that "[w]hen Hughes conducted the simulated landing tests that produced only a three inch clearance, the Army did not order additional testing or design changes. This was an exercise of discretion. *Boyle* makes clear that the government contractor defense is intended to protect military contractors from state tort liability when they produce equipment conforming to design specifications adopted by gov-

ernment agencies in exercise of their discretion. This is such a case."[10] Id.

The facts and reasoning of *Landgraf* are directly applicable to this case in two ways. First, this case demonstrates that, despite what appears to be, and what would under normal contract and tort principles clearly be, precise "specification" language, in order to determine whether such a provision is a *Boyle* specification the court must view it in the context of its use and intended meaning by the government and contractor. In this respect, the present case on appeal is an a fortiori case with respect to *Landgraf*, because in *Landgraf* there was very specific quantitative and mandatory language in a specific contractual document. In our case, we have no document; the available language is precisely contrary to the meaning sought to be ascribed to it; and that meaning can only be arrived at by reading it into one isolated deposition passage taken out of context and in a manner contrary to the rest of the record.

Second, even if we were to indulge in the inference that "maximum" could have meant "minimum," the government's treatment of the MOH in this case following the incident in Israel in 1982, nearly one year before the crash in Egypt in this case, precisely parallels the government's treatment of the much more specific MIL-S-8698 in *Landgraf*. In this regard, the following facts are undisputed. In May, 1982, an inlet vented side plate (IVSP) vane pump installed on an Israeli-owned F-16 failed to start on the runway, after 341 hours of operation, due to heavy cavitation erosion. As a result,

---

[10] I see no basis for the majority's assertion that the requirement that the clearance " '*not be less than* 9 inches, and preferably 12 inches' may be reasonably construed as less precise than '600 MOH,' " especially under the circumstances of these cases. In *Landgraf*, the government required that the rotors have a clearance of not less than nine inches. In this case, the contractors and government determined that the maximum operating hours for the pump was 600. I read the *Landgraf* requirement to set a floor, whereas the MOH, it seems to me, set a ceiling.

a team of United Technologies and Chandler-Evans personnel inspected the pumps in service in Israel. Their report, dated July 21, 1982, discloses that they inspected forty-one pumps, and found that twenty-one, or approximately 50 percent, had cavitation erosion severe enough "to prevent continued use out to MOH."[11] The cause of the cavitation erosion was not determined. The Israelis were instructed to inspect the pumps at 300 hours of operation, rather than to await the 600 MOH, and they further agreed to "continue a 300 hour vane inspection of pumps for at least a year," to "[p]ublish a report of findings to date," and to "inspect sample pumps already documented at 50 hour intervals out to MOH." In addition, the Israeli pumps were replaced with modulated bypass pumps on an expedited basis. Thereafter, later in 1982, the defendants determined that the accelerated cavitation erosion of the Israeli pumps was due in large part to the particular type of fuel that the Israeli aircraft were using, and, in October, 1982, the Israeli government was so informed.

Because of strict United States government directives prohibiting the defendants from releasing information to foreign governments, the defendants were required to channel the results of their investigation through the government. Thus, the government directed the defendants to coordinate all information developed as a result of the investigation through the United States Air Force F-16 team stationed in Israel. Accordingly, the government was fully aware of the entire Israeli incident and all of the information yielded by the investigation. The result was that, on January 10, 1983, before the crash in Egypt in this case, the Air Force issued a written order requiring all F-16s to be retrofitted with the modulated bypass configured

---

[11] Thus, it is clear that the pumps they inspected had not yet reached their MOH.

pumps "[a]t [the] time of first return to depot for major overhaul or repair."[12] The government did not suggest or order a revision of the MOH downward. Nor did it suggest that the defendants had breached any warranty to it by having produced fuel pumps that did not perform safely up to the MOH.

Thus, even though the government was fully aware, from July, 1982, forward, that the pumps were subject to accelerated cavitation erosion that prevented meeting the MOH, the government retained the existing MOH, permitted the fuel pumps to continue in use and simply ordered them retrofitted at their next overhaul. This conduct by the government brings this case squarely within the rationale of *Landgraf*.

Although the Air Force knew that the pumps did not meet the MOH, "the [Air Force] ordered no further changes in the [MOH]. This is strong evidence that the [Air Force] considered the contents of [the MOH] as stating a desirable goal and a recommended way of achieving it, but not [a] precise [specification]. We do not believe the [Air Force] treated the [MOH] as formulating mandatory requirements. By permitting [use] to continue without any change in [the MOH] following the [Israeli investigation], the [Air Force] made a discretionary decision to not insist on the [performance] recommended in [the MOH]." *Landgraf* v. *McDonnell Douglas Helicopter Co.,* supra, 993 F.2d 564.

Furthermore, when the defendants furnished to the Air Force the results of the investigation that disclosed that, under certain circumstances, the MOH was not being met, the Air Force did not revise the MOH. "This was an exercise of discretion. *Boyle* makes clear that the government contractor defense is intended to pro-

---

[12] Thus, contrary to the assertion of the majority, the government did take action beyond that taken in Israel and did not, at that time, "[believe] the cause of the problem to be localized."

tect military contractors from state tort liability when they produce equipment conforming to design specifications adopted by government agencies in the exercise of their discretion. This is such a case." Id.

This emphasis on the protection of the government contractor when it follows discretionary decisions by the government is central to the government contractor defense. In determining whether a particular standard is a reasonably precise specification "for purposes of the government contractor defense, the proper focus is on the protection of discretionary governmental functions for which the defense is intended. If a defect is one inherent in the product or system that the government has approved, it will be covered by the defense. Where a defect is merely an instance of shoddy workmanship, it implicates no federal interest. This distinction between 'aberrational' defects and defects occurring throughout an entire line of products is frequently used in tort law to separate defects of manufacture from those of design. . . . Stated another way, the distinction is between an unintended configuration, and an intended configuration that may produce unintended and unwanted results." (Citation omitted.) *Harduvel* v. *General Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989), cert. denied, 494 U.S. 1030, 110 S. Ct. 1479, 108 L. Ed. 2d 615 (1990).

This passage is central to an understanding of the government contractor defense, especially as it applies to this case. This passage says that once the government contractor comes forward with proof that it met the three elements of the *Boyle* test, which concern *design* specifications, in order for the plaintiff to defeat the contractor's defense the plaintiff must establish that, with respect to any of those design specifications, the contractor did not "conform"—that is, the contractor produced a *manufacturing* defect with respect to that specification. That is what the plaintiff is trying

to do here: establish that the MOH is such a design specification—a *Boyle* specification—and that the contractor did not, with respect to this aircraft, conform to it—i.e., produced a manufacturing defect.

In the case before us, there is no evidence that the failure to meet the MOH was an instance of a manufacturing defect, of shoddy workmanship, or that it constituted an "unintended configuration." To the contrary, all of the evidence is that the MOH was a goal that was not met. It was not a *Boyle* specification. Therefore, the failure to conform to it does not defeat the defendants' showing of the three elements of the *Boyle* test. Put another way, the failure to meet this goal was an unintended and unwanted result of the construction of the F-16 within its intended configuration, i.e., according to those standards that *were* "reasonably precise specifications."

In this connection, the trial court concluded that there was no evidence produced before it of any manufacturing defect. An examination of this record demonstrates that this conclusion is correct. Indeed, as United Technologies points out in its brief in this court, the plaintiff's expert, John M. Wetzler, was not designated to testify at trial that the pump or engine in Dighidi's F-16 did not meet the government's specifications. The record confirms that. The plaintiff's responses to United Technologies' request for interrogatories indicates that the plaintiff offered Wetzler as an expert to testify to *design* defects, not *manufacturing* defects.

The conclusion that the MOH cannot be properly viewed as a "reasonably precise specification" within the meaning of *Boyle* is consistent, moreover, with the other prevailing case law on the government contractor defense. In each of the following military aircraft cases, the government contractor defense was upheld as a matter of law, either by way of summary judgment

or by way of reversal of a judgment for the plaintiff and direction of a judgment for the defendant, and in each case the court rejected, as a matter of law, the plaintiff's claim of a failure to conform to a reasonably precise specification that was much like the MOH in this case. *Kleemann* v. *McDonnell Douglas Corp.*, 890 F.2d 698, 703 (4th Cir. 1989) (failure of landing gear on F/A-18; "general qualitative specifications" held not to be reasonably precise specifications), cert. denied, 495 U.S. 953, 10 S. Ct. 2219, 109 L. Ed. 2d 545 (1990); *Sundstrom* v. *McDonnell Douglas Corp.*, 816 F. Sup. 577, 584 (N.D. Cal. 1992) (failure of ejection seat on F-16C aircraft; "qualitative, precatory goals" held not to be reasonably precise qualifications); *In re Aircraft Crash Litigation, Frederick, Maryland*, 752 F. Sup. 1326, 1338 (S.D. Ohio 1990) (malfunction of flight control system on EC-135N aircraft; "performance specification" held not to be reasonably precise specification), aff'd sub nom. *Darling* v. *Boeing Co.*, 935 F.2d 269 (6th Cir. 1991).

Cases such as these, as well as *Landgraf*, are particularly instructive in our determination of whether the government contractor defense was properly applied in this case, as I believe it was. The defense is a matter of federal common law, designed to protect uniquely federal interests, including the procurement of military hardware. *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1315. "The government contractor defense is a matter of federal common law, and so is the denomination of a defect as one of design or manufacture for purposes of applying the defense. Were this not so, state law could operate either to defeat the defense or to expand it improperly, and the defense could not be applied with the uniformity that is a key justification for application of federal common law." Id., 1317. State courts are not permitted to shrink the defense to less than its proper dimensions. That, however, is precisely what the majority has done in this case.

## OTHER REASONABLY PRECISE SPECIFICATIONS

I also disagree with the reasoning and conclusions of the majority regarding the "other government specifications," that is, specifications other than the MOH, to which the plaintiff claims the defendants did not conform, and the effect thereon of the form DD-250. I submit that, even if these "other" standards are considered to be *Boyle* specifications, the trial court was correct that the signing of the DD-250 established that the defendants had conformed to them. Moreover, as with the MOH, even if the DD-250 is not dispositive, there is no reasonable basis for finding that these "other government specifications" are *Boyle* specifications.

It is undisputed in this record that, as the majority itself states, the "government also required design alterations on the IVSP after the initial bench qualification test. *Each of the defendants' products was given final and separate approval by the government after extensive testing. Both flight and ground inspections were completed for each F-16 by the Air Force plant representative at General Dynamics, and, upon approval of each aircraft, the government executed a DD-250 certifying that the aircraft conformed to all applicable specifications.*"

Indeed, the deposition testimony of Samuel Arline indicates clearly that this preapproval testing and resulting approval by the government also took place with respect to the pump. He testified that, before acceptance by the government, "engines are tested in Hartford against a test specification. The government representative in Hartford reviews our results of the testing and all of the other paperwork associated with the engine. And if he's satisfied with that it's all in order and it meets the test requirements, then he will sign

the DD-250 . . . [saying] [w]e accept it." Specifically with regard to the pump, Arline testified that "we have imposed on us a government quality document that requires that the parts that are delivered are essentially signed off—in this case, the pump, is signed off by a government representative at the supplier's plant before delivery. He signs the paperwork saying as far as he knows this pump was built and tested in accordance with all of the specifications in existence at that time."

It is true, as the majority argues, that the signing of a DD-250 does not automatically constitute approval under *Boyle*. That does not mean, however, that it cannot, under appropriate circumstances, constitute such approval as a matter of law. These are such circumstances.

"[A]ctive governmental oversight is relevant to all three elements of [the] defendant's burden [of establishing the government contractor defense]" including government approval of reasonably precise specifications. *Kleemann* v. *McDonnell Douglas Corp.*, supra, 890 F.2d 701. Extensive governmental participation in the approval process enhances the likelihood of product conformity to the specifications. Id. Where there has been pervasive governmental involvement in design and manufacture, including substantive governmental review of all design decisions and substantial governmental involvement in presigning testing, the signing of a DD-250 constitutes approval. *In re Aircraft Crash Litigation, Frederick, Maryland,* supra, 752 F. Sup. 1360–61.

It is true that a "rubber stamp" approval by the government will not suffice for approval under *Boyle*. *Trevino* v. *General Dynamics Corp.*, 865 F.2d 1474, 1479 (5th Cir. 1989). The "rubber stamp" doctrine, however, serves to separate out those cases in which

the government exercises no significant discretion in signifying approval; see id. (design delegated to contractor, and government agent merely checked approval box at bottom of each page of design); from those cases in which the court "necessarily inquires into whether the Government adequately exercised its discretion and thereby limit[ed] the contractor's ability to accommodate safety in a different fashion." (Internal quotation marks omitted.) *Lewis* v. *Babcock Industries, Inc.*, 985 F.2d 83, 87 (2d Cir.), cert. denied, 509 U.S. 924, 113 S. Ct. 3041, 125 L. Ed. 2d 727 (1993). When, before signifying its approval, the government participates extensively in testing for conformity to specifications, there is no rubber stamp, and acceptance can constitute approval as a matter of law. *Kleemann* v. *McDonell Douglas Corp.*, supra, 890 F.2d 702–703; *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1320–21; *Sundstrom* v. *McDonnell Douglas Corp.*, supra, 816 F. Sup. 583; *In re Aircraft Crash Litigation, Frederick, Maryland*, supra, 752 F. Sup. 1360–61.

It is undisputed in this record that the government's approval, evidenced by the signing of the DD-250, in this case was preceded by extensive governmental involvement in the design and manufacture stages, and by extensive governmental involvement in the preapproval testing process. Thus, these facts go far beyond a rubber stamp approval, and constitute governmental approval as a matter of law.

Moreover, even if the DD-250 were not dispositive under the facts of this case, review of the record before the trial court can only lead to the conclusion that none of the standards that the plaintiff alleges to have been violated by the defendants constitutes a *Boyle* specification. The trial court therefore correctly concluded that "[t]here [was] no evidence in the record that the failure of the main fuel pump was due to a manufacturing defect."

First, it is difficult to fashion a response to the majority's contention that the plaintiff's claim that "the pump was defective [because] cavitation rates were excessive and therefore caused excessive damage to the IVSP configured MFP-330" precludes summary judgment in this case. I cannot conceive of how this general claim raises an issue of material fact as to whether a reasonably precise specification was disregarded by the defendants, resulting in a manufacturing defect. This is no more a claim that the defendants violated a reasonably precise specification than is a claim that the roof was defective because rain came in and therefore caused me to get wet. Similarly, the claim that "the pump did not perform within the required usage and fuel parameters" is basically a claim that the pump did not work properly. As a matter of law, these assertions do not constitute reasonably precise specifications.

With respect to the laundry list of "purchase performance specifications" cited by the majority and by the plaintiff in a footnote in his brief,[13] these are no more *Boyle* specifications than the MOH. All of these pur-

---

[13] The majority states that "the plaintiff claims that the IVSP failed to comply with the following purchase performance specifications: (1) specifications 3.2.2.11 and 3.2.8, which require that all metallic or parametallic parts have a minimum operational life of 4000 hours and be designed for a life of 6000 hours; (2) specifications 3.2.2.12 and 3.2.2.13, which require that the pump supply 'the required amount of fuel at the required pressures for the operation of the engine throughout its complete operating range defined [in detail] by this specification' with or without assistance from the boost pump; (3) specification 3.2.3, which requires the pump to 'operate continuously, efficiently and safely in accordance with its specified performance characteristics under the environmental standards specified'; (4) specification 3.2.3.2, which requires the pump to permit the engine to 'air-start' within certain parameters after pump failure; (5) specifications 3.2.5.2, 3.2.5.5, 3.2.6.1 and 3.2.6.2, which require the pump to perform normally within a range of temperature, altitude, air flow and flight maneuver conditions; and (6) specification 3.3.1.6, which requires the pump to function 'in world wide corrosive and erosive environments without elaborate protective procedures.' "

chase performance specifications arise from a document promulgated in August, 1972, by Pratt and Whitney Aircraft (Pratt & Whitney), almost two years before the government approved the first production F100 engine that incorporated the MFP-330 in June, 1974. "It is . . . the Detail Specifications, as ultimately evolved through the give and take between the Air Force and its contractors, to which [the] Defendants' equipment must conform under *Boyle.*" *In re Aircraft Crash Litigation, Frederick, Maryland*, supra, 752 F. Sup. 1369, citing *Kleemann* v. *McDonnell Douglas Corp.*, supra, 890 F.2d 702. These "specifications" relied on by the plaintiff are exactly the sort of performance goals or performance specifications that have been expressly rejected under the post-*Boyle* case law as having any relevance to the government contractor defense.

For example, the provision that "all metallic or parametallic parts have a minimum operational life of 4000 hours and be designed for a life of 6000 hours" is wholly unexplained by the majority and, as far as I can tell, by anyone else in this case. I do not know what it means, and I submit that neither does anyone else on this court. Neither the majority nor the plaintiff offers any deposition testimony or other record citation explaining its origin, how or when it was arrived at, what its technical meaning is, or what it was considered to mean by the government and contractors. Furthermore, as is indicated above, there was no evidence that any failure to conform to such a provision caused the crash of this F-16. It is beyond me, therefore, how the trial court, on the basis of the record established by the plaintiff, could have considered this to raise any issue of material fact.

The remainder of these other "engine specifications," namely, that: the pump supply the required amount of fuel at the required pressures for the operation of the

engine throughout its complete operating range with or without assistance from the boost pump; the pump operate continuously, efficiently and safely in accordance with its specified performance characteristics under the environmental standards specified; the pump permit the engine to 'air-start' within certain parameters after pump failure; the pump perform normally within a range of temperature, altitude, air flow and flight maneuver conditions; and the pump function in world wide corrosive and erosive environments without elaborate protective procedures; are, similarly, precatory in nature. Presenting these as *Boyle* specifications is simply contrary to the law on what such a specification is and is not, as Chandler-Evans correctly points out in its brief in this court.

Without belaboring the point, I submit that the applicable case law makes it clear that these types of provisions are not *Boyle* specifications. See, e.g., *Kleemann* v. *McDonnell Douglas Corp.*, supra, 890 F.2d 702; *Harduvel* v. *General Dynamics Corp.*, supra, 878 F.2d 1320; *Sundstrom* v. *McDonnell Douglas Corp.*, supra, 816 F. Sup. 597; *In re Aircraft Crash Litigation, Frederick, Maryland,* supra, 752 F. Sup. 1326. As these cases make clear, and as the record of this case also makes clear, general standards such as these are considered general precatory goals or performance specifications, and not *Boyle* specifications. They often derive from the government's request for proposal (RFP). An RFP serves merely as the general outline of the aircraft or component thereof that the government seeks to purchase, but which, in a case such as the F-16 engine, is something that has never been designed and manufactured before. After an RFP has been issued and responded to, and a contractor chosen, the "back and forth" process described by the majority takes place and results ultimately in the "reasonably precise specifications" contemplated by *Boyle*.

"Only the detailed, quantitative specifications—and not those calling for such vagaries as a failsafe, simple or inexpensive product—are relevant to the government contractor defense. . . . Nonconformance to precise specifications must mean more than that the design does not work in compliance with some general admonition against an unwanted condition." (Internal quotation marks omitted.) *Kleemann* v. *McDonnell Douglas Corp.*, supra, 890 F.2d 703. Considering these "other" standards as "reasonably precise specifications" within the meaning of *Boyle*, as the majority does, eviscerates *Boyle* for all practical purposes and is contrary to the federal common law governing the government contractor defense.

Accordingly, I dissent, and I would affirm the judgment of the trial court.