[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Prudential commenced this interpleader action by complaint on December 2, 1994, to settle a dispute between the defendant Jack Bender (defendant/father), and the defendants David and Norman Bender (defendants/sons).[1] The dispute concerned the ownership of approximately 1000 shares of Bristol Myers stock. The shares were originally owned by the defendant/father and were kept in his own individual account. The shares are currently being held by Prudential after a transfer from the defendant/father's individual account to a joint account in the names of all three defendants.
Prudential requested that the court enter an interlocutory judgment requiring the defendants to interplead together concerning their claims to the shares and the assets held by Prudential on behalf of the account. In doing so, Prudential claimed no interest in the account and requested to be discharged from all liabilities to the defendants. The defendants/sons filed an answer and counterclaim on June 21, 1996, in which they CT Page 3590 alleged ownership rights in the remaining shares and the proceeds from a sale of 100 of the shares, as well as conversion by Prudential in its handling of the shares. The defendant/father refused to appear in the interpleader action, and instead filed an arbitration proceeding, citing the mandatory arbitration provision in the signed Customer Agreement for his individual account. The defendants/sons refused to participate in the arbitration.
Prudential filed a motion to stay the arbitration with the defendant/father, and the defendant/father filed a motion to compel Prudential to arbitrate. The Court granted the defendant/father's motion to compel arbitration. Prudential also filed a motion to compel arbitration against the defendants/sons, which they opposed. The court denied Prudential's motion without articulation.
Two arbitration hearings between the defendant/father and Prudential were held in New York before the American Arbitration Association on February 5, 1997, and February 20, 1997. On March 19, 1997, the arbitrators, without articulation, decided that the shares and any proceeds therefrom belong to the defendant/father. As such, Prudential withdrew the interpleader action.
On May 23, 1997, Prudential filed a motion for summary judgment against the defendants/sons. Prudential moves for summary judgment on the grounds that the defendants/sons have no ownership interest in the shares given that the defendant/father did not complete a valid gift to them; that Prudential had the right to transfer the shares to the defendant/father's individual account in accordance with his instructions; and that the doctrine of collateral estoppel precludes the defendants/sons from litigating the issue of ownership rights to the shares.
As required by Practice Book § 204, Prudential filed and served a memorandum of law, in which it briefly outlined its legal claims and the pertinent authority relied upon, in support of its motion for summary judgment. Additionally, Prudential complied with Practice Book § 380 as it filed documents in support of its motion for summary judgment. The defendants/sons did not comply with Practice Book § 380 as they failed to file any affidavits, memoranda or other available documentary evidence in opposition to Prudential's motion for summary judgment.[2]
CT Page 3591
While considering Prudential's motion, the court concluded that Article 8 of the Uniform Commercial Code (UCC) governs security investments, such as the shares at issue in the present case. As such, the court ordered the parties to brief the issue as to Article 8's effect, if any, on the present litigation. On November 19, 1997, Prudential filed a supplemental memorandum in support of its motion for summary judgment. Additionally, the defendants/sons filed a memorandum on November 26, 1997, addressing the possible effect of Article 8 on the present litigation.
A motion for summary judgment shall be granted "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 384.[3] Summary judgment "is appropriate only if a fair and reasonable person could conclude only one way." Miller v. United Technologies Corp., 233 Conn. 732, 751,660 A.2d 810 (1995). "[A] summary disposition . . . should be on evidence which a jury would not be liberty to disbelieve and which would require a directed verdict for the moving party." (Internal quotation marks omitted.) Id., 752.[4] "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) Bruttomesso v. N.E. Conn.Sexual Assault Crisis Services, Inc., 242 Conn. 1, 5,698 A.2d 795 (1997).
Article 8 of the UCC governs investment securities. General Statutes § 42a-8-101. As such, it "sets up the method of the transfer of stock." (Internal quotation marks omitted.) Jaworskiv. Dwyer, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 521516 (October 26, 1995, Allen,
S.T.R.). Section 42a-8-313 of the General Statutes, which sets forth the manner in which stock may be transferred, does not make a specific reference to transfers by gift. General Statutes § 42a-8-313 (repealed eff. October 1, 1997). It does, however, make reference to a "purchaser" of stock. General Statutes § 42a-8-313 (repealed eff. October 1, 1997). "[T]he definition section of the Code defines the word purchase as including a gift and the word purchaser as including a donee." (Internal quotation marks omitted.) Jaworski v. Dwyer, supra Superior Court, Docket No. 521516. As such, General Statutes § 42a-8-313 is applicable in situations involving gifts of stock.[5]
CT Page 3592
There is no appellate authority addressing the issue of to whether Article 8 of the UCC displaced the common law concerning gifts of stock.[6] Two Superior Court cases indicate that Article 8 does not displace the common law. Therefore, both Article 8 and the common law would be applicable to gifts of stock. See Solomon v. Allen, Superior Court, judicial district of Middlesex at Middletown, Docket No. 67811 (March 18, 1994,Spallone, S.T.R.) (applying both Article 8 of the UCC and the common law regarding gifts a case concerning an inter vivos gift of stock); Jaworski v. Dwyer, supra, Superior Court, Docket No. 521516 (same). The court's resolution of Prudential's motion for summary judgment remains the same whether both Article 8 of the UCC and the common law of gift are applied, or only Article 8 of the UCC is applied. As such, the court will apply both Article 8 and the common law to the facts of this case.
I. Common Law of Gifts
The defendants/sons allege that they were joint tenants, along with the defendant/father, with respect to the shares of Bristol Myers stock in the joint account. Prudential moves for summary judgment on the ground that the defendants/sons have no ownership interest in the shares because the defendant/father did not make a valid gift of stock to the defendants/sons.
To constitute a valid gift inter vivos, "there must be not only a delivery of possession of the property but also an intent on the part of the donor that title shall pass immediately."Bergen v. Bergen, 177 Conn. 53, 56-57, 411 A.2d 22 (1979). "While the change of possession may be either actual or constructive, it must be such as is consistent with the nature of the property and the situation of the parties. . . . For a constructive delivery, the donor must do that which, under the circumstances, will in reason be equivalent to an actual delivery. It must be as nearly perfect and complete as the nature of the property and the circumstances will permit." (Citation omitted.) Hebrew UniversityAssn. v. Nye, 26 Conn. Sup. 342, 344, 223 A.2d 397 (1966). "The gift may be perfected when the donor places in the hands of the donee the means of obtaining possession of the contemplated gift, accompanied with acts and declarations clearly showing an intention to give and to divert himself of all dominion over the property." Candee v. Connecticut Savings Bank, 81 Conn. 372, 375,71 A. 551 (1908).
In August of 1997, the defendant/father contacted Prudential CT Page 3593 in order to establish a joint account in the name of all three defendants. Appendix (App. ), Tab A, Arbitration Transcript (Trans.), p. 9, lines 10-25; p. 10, lines 2-6. To accomplish this end, the defendant/father signed a letter of authorization to transfer the shares from his individual account to the joint account. App., Tab C, Prudential Exhibit 1. According to the letter of authorization, the defendant/father "relinquish[ed] all right, title, and interest" in the shares in favor of all three defendants named on the joint account. App., Tab C, Prudential Exhibit 1.
Thereafter. Prudential forwarded account opening documents for the joint account to all three defendants at the defendant/father's address. App., Tab B, Bender Exhibit 3. According to testimony presented at the arbitration hearing, Prudential considered this mailing to be directed only to the defendant/father as it was sent to his address. App., Tab A, Trans., p. 72, lines 6-10. Pursuant to Prudential's policies, all persons listed on the account were required to sign the documents before the joint account would be activated. App., Tab D, Affidavit of James Lapides (Aff.), pp. 2-3, ¶ 9. The defendant/father, however, advised Prudential that he would not sign the account opening documents, and instead wanted to terminate the process of establishing the joint account. App., Tab D, Aff., p. 3, ¶ 10. According to Prudential, the joint account was never validly opened given that Prudential did not receive signed account opening documents. App., Tab D, Aff., p. 3, ¶ 11. Prudential then returned the shares to the defendant/father's individual account pursuant to his instruction. App., Tab D, Aff., p. 3, ¶¶ 10-11.
Despite Prudential's claim that the joint account was never a validly opened account, other facts indicate that Prudential may have dealt with the shares as if the joint account was an open, valid account. First, Prudential sent a cover letter with the account opening documents addressed to all three defendants at the defendant/father's address, which made reference to the account number for the joint account. App., Tab B, Bender Exhibit 3, p. 2. The first line of the cover letter, addressed to all three defendants, stated: "As the manager of the NEW HAVEN branch, I'd like to thank you for opening an account with Prudential Securities Incorporated." (Emphasis added.) App., Tab B, Bender Exhibit 3, p. 2. Second, Prudential sent a client statement to the defendant/father's address in the name of all three defendants regarding the account number for the joint CT Page 3594 account. App., Tab B, Bender Exhibit 4. The statement indicates in the "Account Activity" section that 1,000 shares of Bristol Myers stock was received in the joint account from the defendant/father's individual account, and that 100 shares of the Bristol Myers stock was then sold. App., Tab B, Bender Exhibit 4, p. 2.
The testimony of the defendant/father at the arbitration hearing also indicates that perhaps the joint account was opened by Prudential. For example, the defendant/father stated: "So he transferred [the 1000 shares of Bristol Myer's stock] from 042-49691-2, which is my own personal account, to this new account, which was opened and it was number 556670. So as soon as I bought it and paid for it I transferred it." (Emphasis added.) App., Tab A, Trans., p. 17, lines 12-16. Another statement by the defendant/father indicates that Prudential conducted transactions with the shares in the name of all three defendants prior to transferring the shares back to the defendant/father's individual account. See App., Tab A, Trans., p. 19, lines 7-16 (stating that "when I told him to return [the shares to my individual account], then he canceled the sale that was in the name of the children so that it would bring the stock back to a thousand shares. Then he returned a thousand shares to me and then he consummated the transaction of the 100 shares as if it was sold from mine all the way. He didn't want any transaction to be in the name of both of the people because they had never had a signed agreement and they didn't want any transaction.").
Much of the evidence presented to the court is in conflict regarding the opening of the joint account and whether a delivery of the gift of the shares was made. Viewing the evidence in the light most favorable to the non-movant, there remain genuine issues of material fact regarding whether delivery of the shares was accomplished. Therefore, the motion for summary judgment is denied on this ground.
II. Uniform Commercial Code Article 8
The defendants/sons allege that they were joint tenants, along with the defendant/father, with respect to the shares of Bristol Myers stock in the joint account. Prudential moves for summary judgment on the ground that the defendants/sons have no ownership interest in the shares because the defendant/father did not make a valid gift of stock to the defendants/sons. CT Page 3595
In addressing the applicability of Article 8 to the present case, both parties agreed that if General Statutes § 42a-8-313 does apply, the applicable subsection is (d). "Transfer of a security . . . to a purchaser occurs only . . . at the time a financial intermediary . . . sends him confirmation of the purchase and also by book entry. . . ." General Statutes § 42a-8-313 (d) (repealed eff. October 1, 1997). For General Statutes § 42a-8-313 (d) to be satisfied, the financial intermediary must send confirmation of the purchase to the purchaser, as well as make a book entry regarding the transfer.
According to the affidavit of James Lapides, a Prudential financial advisor, Prudential "had absolutely no contact with either Norman or David Bender" between the time the defendant/father initially began the account opening process and the time the defendant/father decided to terminate the account opening process. App., Tab D, Aff., p. 4, ¶ 12. This statement fairly implies that Prudential never made verbal or written contact with the defendants/sons, and this would naturally include never sending confirmation of the transfer to the defendants/sons.
Despite this implication, other facts indicate that Prudential may have sent out confirmation of the transfer to the defendants/sons. After signing the transfer authorization, Prudential forwarded account opening documents for the joint account to all three defendants at the defendant/father's address. Additionally, Prudential sent a client statement to the defendant/father's address in the name of all three defendants, and the account number listed on this statement was for the joint account. Additionally, the statement indicates in the "Account Activity" section that 1,000 shares of Bristol Myers stock was received in the joint account from the defendant/father's individual account, and that 100 shares of the Bristol Myers stock was then sold.
Much of the evidence presented to the court is in conflict regarding whether the correspondence from Prudential, addressed to all three defendants and mailed to the defendant/father's address, constitutes confirmation as contemplated by General Statutes § 42a-8-313.[7] Viewing the evidence in the light most favorable to the non-movant, there remain genuine issues of material fact regarding whether Prudential sent confirmation the transfer to the defendants/sons. Therefore, the motion for summary judgment is denied on this ground. CT Page 3596
III. Collateral Estoppel
The defendants/sons allege that they were joint tenants, along with the defendant/father, with respect to the shares of Bristol Myers stock in the joint account. Prudential moves for summary judgment on the ground that the doctrine of collateral estoppel precludes the defendants/sons from litigating the issue of ownership rights to the shares given that they could have joined the arbitration proceeding between the defendant/father and Prudential which addressed that exact issue.[8]
"[C]ollateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim." (Internal quotation marks omitted.) Mazziotti v. Allstate Ins. Co., 240 Conn. 799, 812,695 A.2d 1010 (1997). "[T]he concept [of privity] exists to ensure that the interests of the party against whom collateral estoppel . . . is being asserted have been adequately represented because of his purported privity with a party at the initial proceeding." (Internal quotation marks omitted.) Id., 813.
"In determining whether privity exists, [the court] employ[s] an analysis that focuses on the functional relationships of the parties. Privity is not established by the mere fact that persons may be interested in the same question or in proving or disproving the same set of facts. Rather, it is, in essence, a shorthand statement for the principle that collateral estoppel should be applied only when there exists such an identification in interest of one person with another as to represent the same legal rights so as to justify preclusion." (Citation omitted.)Mazziotti v. Allstate Insurance Co., supra, 240 Conn. 814.
All three defendants are interested in determining the ownership rights in the shares. However, that is the extent of the similarity in interests between the defendant/father and the defendants/sons. The defendant/father claims that he owns the shares outright, and the defendants/sons claim that they own the shares with the defendant/father as joint tenants. They represent conflicting, rather than the same, legal rights. Additionally, the interests of the defendants/sons were not adequately represented at the arbitration proceedings. The defendants/sons were not parties to arbitration, and their claims of ownership to the shares was not advocated by anyone to the arbitration CT Page 3597 panel.[9] Rather, the defendant/father advocated his own claim of outright ownership of the shares to the arbitration panel, and Prudential did not advocate for ownership on behalf of any of the defendants.
Therefore, the defendants/sons and the defendant/father are not in privity, and the defendants/sons are not collaterally estopped from litigating the issue of ownership of the shares. As such, the motion for summary judgment is denied on this ground.
There remain genuine issues of material fact regarding whether delivery of the shares was accomplished. Another genuine issue of material fact is whether Prudential sent confirmation of the transfer to the defendants/sons. Finally, the defendants/sons are not in privity with the defendant/father, and are not collaterally estopped from litigating the issue of ownership of the shares. Therefore, Prudential's motion for summary judgment is denied on all three grounds.
Howard F. Zoarski Judge Trial Referee